IN THE SUPREME COURT OF NORTH CAROLINA

No. 113A15

Filed 29 January 2016

STATE OF NORTH CAROLINA, upon the relation of PATRICK L. McCRORY, individually and in his official capacity as Governor of the State of North Carolina; JAMES B. HUNT, JR.; and JAMES G. MARTIN

v.

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; and, in their official capacities as members of the Coal Ash Management Commission, HARRELL JAMISON AUTEN III, TIM L. BENNETT, D. ALLEN HAYES, SCOTT FLANAGAN, RAJARAM JANARDHANAM, and LISA D. RIEGEL

Appeal pursuant to N.C.G.S. § 7A-27(a1) from a decision and judgment entered on 16 March 2015 by a three-judge panel of the Superior Court, Wake County, appointed under N.C.G.S. § 1-267.1(b1). Heard in the Supreme Court on 30 June 2015.

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester, David C. Wright, III, and Andrew A. Kasper, for plaintiff-appellee Governors; and Office of General Counsel to the Governor, by Robert C. Stephens, Jr., General Counsel, and Jonathan R. Harris, Associate General Counsel, for Governor McCrory, plaintiff-appellee.*

*K&L Gates LLP, by John H. Culver III and Brian C. Fork, for legislator defendant-appellants; and Roy Cooper, Attorney General, by Alexander McC. Peters, Senior Deputy Attorney General, and Melissa L. Trippe and Ann W. Matthews, Special Deputy Attorneys General, for Coal Ash Management Commission defendant-appellants.*

*Arch T. Allen III, pro se, amicus curiae.*

*Troutman Sanders LLP, by Christopher G. Browning, Jr. and C. Elizabeth Hall, for Carolinas AGC (Associated General Contractors), Employers Coalition of North Carolina, National Federation of Independent Business Small Business Legal Center, North Carolina Chamber, North Carolina Forestry*

*Association, North Carolina Home Builders Association, North Carolina Manufacturers Alliance, and North Carolina Retail Merchants Association, amici curiae.*

*Blanchard, Miller, Lewis & Isley, P.A., by E. Hardy Lewis, for North Carolina Council of State members Cherie Berry, Commissioner of Labor; Wayne Goodwin, Commissioner of Insurance; Steve Troxler, Commissioner of Agriculture; and Beth A. Wood, State Auditor, amici curiae.*

*Campbell Shatley, PLLC, by Robert F. Orr, for North Carolina Institute for Constitutional Law, amicus curiae.*

MARTIN, Chief Justice.

Our founders believed that separating the legislative, executive, and judicial powers of state government was necessary for the preservation of liberty. The Constitution of North Carolina therefore vests each of these powers in a different branch of government and declares that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6.

Each branch of government has a distinctive purpose. The General Assembly, which comprises the legislative branch, enacts laws that "protect or promote the health, morals, order, safety, and general welfare of society." *State v. Ballance*, 229 N.C. 764, 769, 51 S.E.2d 731, 734 (1949); *see also* N.C. Const. art. II, §§ 1, 20. The executive branch, which the Governor leads, faithfully executes, or gives effect to, these laws. *See* N.C. Const. art. III, §§ 1, 5(4). The judicial branch interprets the

laws and, through its power of judicial review, determines whether they comply with the constitution. *See id.* art. IV, § 1; *Bayard v. Singleton*, 1 N.C. 5, 6-7 (1787).

The constitution also incorporates a system of checks and balances that gives each branch some control over the others. For example, the Lieutenant Governor is the President of the Senate and casts tie-breaking votes when the Senate is equally divided. N.C. Const. art. III, § 6. At the same time, the General Assembly can assign duties to the Lieutenant Governor. *Id.* Still, the separation of powers clause requires that, as the three branches of government carry out their duties, one branch will not prevent another branch from performing its core functions. *See Hart v. State*, 368 N.C. 122, 126-27, 774 S.E.2d 281, 285 (2015).

In this case, plaintiffs challenge legislation that authorizes the General Assembly to appoint a majority of the voting members of three administrative commissions. Plaintiffs contend that, by giving itself the power to appoint commission members, the General Assembly has usurped Governor McCrory's constitutional appointment power and interfered with his ability to take care that the laws are faithfully executed. Plaintiffs' contentions raise two important questions about the function and structure of state government: (1) Does the appointments clause in Article III, Section 5(8) of the state constitution prohibit the General Assembly from appointing statutory officers to administrative commissions? (2) If not, do the specific appointment provisions challenged in this case violate the separation of powers clause in Article I, Section 6?

We hold that, while the appointments clause itself places no restrictions on the General Assembly's ability to appoint statutory officers, the challenged provisions violate the separation of powers clause. In short, the legislative branch has exerted too much control over commissions that have final executive authority. By doing so, it has prevented the Governor from performing his express constitutional duty to take care that the laws are faithfully executed.

**I**

The Energy Modernization Act and the Coal Ash Management Act of 2014 create three administrative commissions that are housed in the executive branch of government: the Oil and Gas Commission, the Mining Commission, and the Coal Ash Management Commission. *See generally* N.C.G.S. §§ 143B-290 to -293.6 (2014) (effective July 31, 2015); *id.* §§ 130A-309.200 to -309.231 (2014). The Acts also specify how commission members will be appointed and how they may be removed. *See generally id.*

The Oil and Gas Commission is housed in the Department of Environment and Natural Resources (DENR)[1] and has the power to promulgate rules, make

---

[1] The Department of Environment and Natural Resources is now called the Department of Environmental Quality. Current Operations and Capital Improvements Appropriations Act of 2015, ch. 241, sec. 14.30(c), 2015-5 N.C. Adv. Legis. Serv. 38, 322 (LexisNexis). Because the Energy Modernization Act and the Coal Ash Management Act predate this name change and refer to the department as the Department of Environment and Natural Resources, we will continue to use this superseded name.

determinations, and issue orders consistent with the Oil and Gas Conservation Act. N.C.G.S. § 143B-293.1. The commission has nine members: three appointed by the Governor and six appointed by the General Assembly. *Id.* § 143B-293.2(a1). Each member serves a three-year term. *Id.* § 143B-293.2(b). A majority of the members constitutes a quorum for the transaction of business. *Id.* § 143B-293.2(e). The commission elects one of its members to serve as chair. *Id.* § 143B-293.4. The chair appoints members of the commission to a Committee on Civil Penalty Remissions, which has the power to remit civil environmental penalties that DENR imposes. *Id.* § 143B-293.6(b), (c). The Governor may remove any member of the commission for misfeasance, malfeasance, or nonfeasance. *Id.* § 143B-293.2(c)(1).

Like the Oil and Gas Commission, the Mining Commission is housed in DENR. *Id.* § 143B-290. The Mining Commission has the power to promulgate mining rules and affirm, modify, or overrule permit decisions that DENR makes. *Id.* § 143B-290(1)(c)-(e). This commission has eight members: two appointed by the Governor; four appointed by the General Assembly; the chair of the North Carolina State University Minerals Research Laboratory Advisory Committee; and the State Geologist, who is ex officio and nonvoting. *Id.* § 143B-291(a1). Each member serves a six-year term. *Id.* § 143B-291(b). As with the Oil and Gas Commission, a majority of the Mining Commission's members constitutes a quorum for the transaction of business, and the Governor may remove any member for misfeasance, malfeasance, or nonfeasance. *Id.* § 143B-291(d), (f).

The Coal Ash Management Commission is administratively located in the Division of Emergency Management of the Department of Public Safety but is expressly required to exercise its powers and duties "independently," without "the supervision, direction, or control of the Division or Department." *Id.* § 130A-309.202(n). This commission has the power to review and approve coal ash surface impoundment classifications and closure plans that DENR proposes. *Id.* § 130A-309.202(f); *see also id.* §§ 130A-290(a)(4a), -309.213, -309.214. The commission has nine members: three appointed by the Governor and six appointed by the General Assembly. *Id.* § 130A-309.202(b). Each member serves a six-year term. *Id.* § 130A-309.202(o). Five members constitute a quorum for the transaction of business. *Id.* § 130A-309.202(h). The Governor appoints the chair of the Coal Ash Management Commission from among the nine members, and that member serves as chair at the pleasure of the Governor. *Id.* § 130A-309.202(c). As with the other two commissions, the Governor may remove any member of the Coal Ash Management Commission for misfeasance, malfeasance, or nonfeasance. *Id.* § 130A-309.202(e).

On 13 November 2014, plaintiffs filed a complaint in Superior Court, Wake County, that challenged the constitutionality of certain provisions in the Acts. Plaintiffs argued that the provisions authorizing the General Assembly to appoint members to the commissions—specifically, N.C.G.S. §§ 130A-309.202(b), 143B-291(a1), and 143B-293.2(a1)—violate the appointments clause in Article III,

Section 5(8) and the separation of powers clause in Article I, Section 6. Plaintiffs also argued that the provision requiring the Coal Ash Management Commission to exercise its powers and duties independently of the Division of Emergency Management and the Department of Public Safety, *see* N.C.G.S. § 130A-309.202(n), violates Article I, Section 6 and Article III, Sections 1 and 5(4). Plaintiffs sought a declaration that the challenged provisions are unconstitutional.[2] In addition, because the General Assembly had already made appointments to the Coal Ash Management Commission, plaintiffs requested that those appointees be removed.

On 16 March 2015, a three-judge panel of the superior court determined that the challenged appointment provisions did not violate the appointments clause but did violate the separation of powers clause. The panel also determined that the Coal Ash Management Commission's independent status violated the separation of powers clause. Finally, the panel dismissed without prejudice plaintiffs' action to remove Coal Ash Management Commission appointees. Defendants appealed directly to this Court pursuant to N.C.G.S. § 7A-27(a1) (2014).

---

[2] Plaintiffs also sought a declaration that a provision of the Coal Ash Management Act requiring the Governor to issue an executive order, *see* N.C.G.S. § 130A-309.202(j) (2014) (repealed 2015), was unconstitutional. The three-judge panel granted declaratory relief to plaintiffs on this issue, and the General Assembly subsequently repealed the provision. Act of Apr. 16, 2015, ch. 9, sec. 1.1, 2015-1 N.C. Adv. Legis. Serv. 63, 65 (LexisNexis). Defendants did not appeal this issue and, in any event, it is moot.

**II**

This Court construes and applies the provisions of the Constitution of North Carolina with finality. *Hart*, 368 N.C. at 130, 774 S.E.2d at 287; *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 479 (1989). We review constitutional questions de novo. *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001). In exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond reasonable doubt. *Hart*, 368 N.C. at 131, 774 S.E.2d at 287-88; *Baker v. Martin*, 330 N.C. 331, 334-35, 410 S.E.2d 887, 889 (1991). In other words, the constitutional violation must be plain and clear. *Preston*, 325 N.C. at 449, 385 S.E.2d at 478. To determine whether the violation is plain and clear, we look to the text of the constitution, the historical context in which the people of North Carolina adopted the applicable constitutional provision, and our precedents. *See id.* at 449, 385 S.E.2d at 479 ("In interpreting our Constitution—as in interpreting a statute—where the meaning is clear from the words used, we will not search for a meaning elsewhere."); *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 613, 264 S.E.2d 106, 110 (1980) ("Inquiry must be had into the history of the questioned provision and its antecedents, the conditions that existed prior to its enactment, and the purposes sought to be accomplished by its promulgation."); *Elliott v. State Bd. of Equalization*, 203 N.C. 749, 753, 166 S.E. 918, 921 (1932) ("Likewise, we may have recourse to former decisions, among which are

several dealing with the subject under consideration."). With these principles in mind, we now examine the two questions raised by defendants' appeal.

**A**

We first address whether the appointments clause in Article III, Section 5(8) prohibits the General Assembly from appointing statutory officers. This clause states: "The Governor shall nominate and by and with the advice and consent of a majority of the Senators appoint all officers whose appointments are not otherwise provided for." N.C. Const. art. III, § 5(8). Plaintiffs contend that the clause gives the Governor broad power to appoint both constitutional and statutory officers. In defendants' view, the appointments clause implicitly gives the appointment power to the General Assembly. They cite the maxim that all power not expressly limited by the people in the constitution remains with the people and "is exercised through the General Assembly, which functions as the arm of the electorate." *Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam). Based on our review of the text of the appointments clause, its historical development, and our precedents interpreting it, we conclude that this clause gives the Governor the exclusive authority to appoint *constitutional* officers whose appointments are not otherwise

provided for *by the constitution*. The appointments clause does not prohibit the

General Assembly from appointing *statutory* officers to administrative commissions.[3]

The Constitution of 1776 did not have an analogue to the appointments clause.

That constitution had specific provisions that expressly authorized the General

Assembly to appoint certain officers. These officers included the Governor, N.C.

Const. of 1776, § 15; all seven members of the Council of State, *id.* § 16; and the judges

of the Supreme Courts of Law and Equity, *id.* § 13. As a result, the General Assembly

was the general appointing authority under our state's first constitution. *People ex*

*rel. Nichols v. McKee*, 68 N.C. 429, 431-32 (1873).

In 1835, the people ratified a constitutional amendment that gave them the

power to directly elect the Governor. N.C. Const. of 1776, Amends. of 1835, art. II,

§ 1. When they ratified the Constitution of 1868, they then shifted appointment

power from the General Assembly to the Governor. *McKee*, 68 N.C. at 433. The

Constitution of 1868 removed all of the provisions that had authorized the General

---

[3] Our interpretation of the appointments clause in the state constitution differs from the United States Supreme Court's interpretation of the federal constitution's appointments clause. Under the latter clause, "[p]rincipal officers are selected by the President with the advice and consent of the Senate," and Congress may allow "[i]nferior officers . . . to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley v. Valeo*, 424 U.S. 1, 132 (1976) (per curiam); *see* U.S. Const. art. II, § 2, cl. 2. The text and drafting history of the federal clause indicate that the framers of the United States Constitution deliberately denied Congress "any authority itself to appoint those who were 'Officers of the United States.' " *Buckley*, 424 U.S. at 129. Congress therefore may not vest the appointment of any officers of the United States with itself or its own officers. *Id.* at 127. North Carolina's appointments clause, however, differs in both text and history.

Assembly to appoint executive and judicial officers.[4]  Instead, it introduced the appointments clause, which stated:

> The Governor shall nominate, and, by and with the advice and consent of a majority of the Senators elect, appoint, all officers whose offices are established by this Constitution, or which shall be created by law, and whose appointments are not otherwise provided for, and no such officer shall be appointed or elected by the General Assembly.

N.C. Const. of 1868, art. III, § 10.

Shortly after the Constitution of 1868 was ratified, this Court stated that the phrase "whose appointments are not otherwise provided for" referred to those appointments not otherwise provided for by the constitution itself.  *People ex rel. Welker v. Bledsoe*, 68 N.C. 457, 462-64 (1873); *State ex rel. Clark v. Stanley*, 66 N.C. 59, 63 (1872).  By 1875, it was "settled that the words 'otherwise provided for' mean[t] otherwise provided for by the Constitution."  *People ex rel. Cloud v. Wilson*, 72 N.C. 155, 158 (1875) (citing *Clark* and *Welker*); *accord Trs. of Univ. of N.C. v. McIver*, 72 N.C. 76, 83 (1875).  This Court also observed that the Constitution of 1868 had "superadded" the phrase "and no such officer shall be appointed or elected by the General Assembly" to ensure that the General Assembly could not appoint constitutional or statutory officers, except where the constitution expressly provided for it.  *Clark*, 66 N.C. at 63; *see also Welker*, 68 N.C. at 463-64; *McKee*, 68 N.C. at 432-

---

[4] The Constitution of 1868 did give the General Assembly the power to appoint members of the Board of Public Charities.  *See* N.C. Const. of 1868, art. XI, § 7.

-11-

34. Under the original version of the appointments clause, then, the Governor had the exclusive power to appoint all constitutional and statutory officers unless the constitution itself provided otherwise. *See also State ex rel. Salisbury v. Croom*, 167 N.C. 223, 226, 83 S.E. 354, 354-55 (1914); *State Prison v. Day*, 124 N.C. 362, 366-67, 32 S.E. 748, 749 (1899).

This expansive shift in the appointment power was "not . . . satisfactory to the dominant sentiment in the State," *Salisbury*, 167 N.C. at 226, 83 S.E. at 355, and was short-lived. In 1876, the people ratified a set of thirty constitutional amendments. John L. Sanders, *Our Constitutions: A Historical Perspective, in* Elaine F. Marshall, N.C. Dep't of Sec'y of State, *North Carolina Manual 2011-2012* 73, 76, https://www.secretary.state.nc.us/Publications/manual.aspx. These amendments restored much of the power that the General Assembly had lost in the Constitution of 1868. *Id.* at 77. One amendment modified the appointments clause, which now stated:

> The Governor shall nominate, and by and with the advice
> and consent of a majority of the Senators elect, appoint all
> officers, whose offices are established by this Constitution,
> and whose appointments are not otherwise provided for.

N.C. Const. of 1868, art. III, § 10 (1876). We have indicated that the people purposefully deleted the phrases "or which shall be created by law" and "and no such officer shall be appointed or elected by the General Assembly" to restore the General Assembly's ability to appoint statutory officers. *See State ex rel. Cherry v. Burns*,

124 N.C. 761, 765, 33 S.E. 136, 137 (1899). In other words, the amended clause no longer gave the Governor the constitutional power to appoint statutory officers. *Id.*; *see also Salisbury*, 167 N.C. at 226, 83 S.E. at 355 ("It will thus be noted that the inhibition on the legislative power to appoint to office is removed and the inherent power of the Governor to appoint is restricted to constitutional offices and where the Constitution itself so provides."). But the amendment did not change the language of the phrase "whose appointments are not otherwise provided for," even though it was ratified in the wake of this Court's authoritative and then-recent pronouncements about that phrase's meaning. *See Welker*, 68 N.C. at 462-64; *Clark*, 66 N.C. at 63. That phrase continued to mean "provided [for] by the constitution." *Cherry*, 124 N.C. at 764, 33 S.E. at 137.

In sum, this amendment to the appointments clause authorized the Governor to appoint only constitutional officers whose appointments were not otherwise provided for by the constitution. Because the scope of the appointments clause after 1876 no longer encompassed statutory officers, the clause did not prohibit the General Assembly from appointing them. *Salisbury*, 167 N.C. at 226, 83 S.E. at 355; *Cherry*, 124 N.C. at 765, 33 S.E. at 137; *Cunningham v. Sprinkle*, 124 N.C. 638, 641, 33 S.E. 138, 138-39 (1899); *Day*, 124 N.C. at 366-67, 32 S.E. at 749; *State ex rel. Ewart v. Jones*, 116 N.C. 570, 571-74, 21 S.E. 787, 787-88 (1895).

The appointments clause did not change again until the people adopted the current version of the clause in the Constitution of 1971. The current appointments clause states:

> Appointments. The Governor shall nominate and by and with the advice and consent of a majority of the Senators appoint all officers whose appointments are not otherwise provided for.

N.C. Const. art. III, § 5(8). When the people enacted the current version of the clause, they deleted the phrase "whose offices are established by this Constitution." But, as in 1876, they did not disturb the phrase "whose appointments are not otherwise provided for." *Compare* N.C. Const. of 1868, art. III, § 10 (1876), *with* N.C. Const. art. III, § 5(8).

We conclude that the latter phrase still means "whose appointments are not otherwise provided for *by the Constitution*." *Welker*, 68 N.C. at 463 (emphasis added). To conclude otherwise would imply that the drafters of the Constitution of 1971 intended to change the meaning of this phrase while using the same words. That inference would not be justified, especially since this Court had already given the phrase a settled construction before 1971.

We also conclude that the omission of the phrase "whose offices are established by this Constitution" in the current version of the appointments clause does not affect the clause's meaning. At first glance, this omission seems to restore the Governor's exclusive power to appoint statutory officers, whose offices are *not* established by the

constitution. But the text of the current clause, as a whole, is unclear. Just as the phrase "whose appointments are not otherwise provided for" refers only to those appointments not otherwise provided for in the constitution itself, the phrase "all officers" might refer only to *constitutional* officers. The report of the North Carolina State Constitution Study Commission that drafted and proposed the Constitution of 1971 resolves this ambiguity. *Cf. Sneed*, 299 N.C. at 615-16, 264 S.E.2d at 112 (relying on this report to discern the meaning of another provision in the current constitution). That report shows that the current appointments clause does not enlarge the Governor's appointment power.

According to the report, the Study Commission did not intend for the proposed constitution's revisions "to bring about any fundamental change in the power of state and local government or the distribution of that power." *Report of the North Carolina State Constitution Study Commission* 4 (1968). The report explains that the proposed constitution contained "editorial pruning, rearranging, rephrasing, and modest amendments," but that the Study Commission had reserved its "more substantial changes" for a separate set of amendments that it was proposing along with the proposed constitution. *Id.* at 29. And the report notes that "[a]bbreviation of the constitution for brevity's sake . . . has been an incident of [the Study Commission's] work, since the great majority of the changes embraced in the proposed constitution take the form of deletions of or contractions in language." *Id.*

The report then addresses the proposed changes to Article III specifically. It states that, although the Study Commission "reorganized and abbreviated" Article III "by the omission of repetitive, legislative-type, and executed provisions," the proposed constitution "contains few substantive changes of note" to that Article. *Id.* at 31. The report goes on to discuss these few substantive changes but does not mention the appointments clause or anything about the appointment power. *See id.*

The report also states that the Study Commission was "recommending several changes that affect the executive branch of state government and especially the Governor," but that "these [changes] are of sufficient moment that they take the form of separate amendments." *Id.* And the Study Commission did propose a separate amendment that would have made significant substantive changes to the appointments clause. *See id.* at 47. The amendment would have given the Governor the power to "appoint and . . . remove the heads of all administrative departments and agencies of the State," and would have stated that "[a]ll other officers in the administrative service of the State shall be appointed and may be removed as provided by law." *Id.* (quoting the Study Commission's proposed Amendment No. 5). Unlike the "general editorial revision" that the adopted language embodied, this amendment entailed "a substantive constitutional change of such importance that . . . the voters should have a chance to act upon it independently." *Id.* at 4. The House Committee on Constitutional Amendments gave the amendment an unfavorable report, however, and the General Assembly did not submit it to the people for

ratification. *See* N.C. House Journal, Reg. Sess. 1969, at 518, 520 (recording the introduction of the proposed amendment in H.B. 880); *id.* at 755, 757 (recording the unfavorable committee report on H.B. 880; no further action noted).

Given how careful the Study Commission was to identify any substantive changes in the proposed constitution—and given that the Study Commission proposed major substantive changes by separate amendments—it would be unreasonable to say that deleting the phrase "whose offices are established by this Constitution" dramatically changed the appointments clause's meaning. The Governor's power to appoint officers under the clause thus continues to extend only to constitutional officers.

As a result, the appointments clause means the same thing now that it did in 1876. It authorizes the Governor to appoint all constitutional officers whose appointments are not otherwise provided for by the constitution. It follows that the appointments clause does not prohibit the General Assembly from appointing statutory officers to administrative commissions.

We now turn to plaintiffs' separation of powers challenge.

**B**

Plaintiffs argue that the challenged provisions violate the separation of powers clause in Article I, Section 6 by preventing the Governor from performing his constitutional duty under Article III, Section 5(4). To address an Article I, Section 6

challenge, we necessarily examine the text of the constitution, our constitutional history, and this Court's separation of powers precedents.

The separation of powers clause declares that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. This principle is fundamental to our form of government and has appeared in each of our state's constitutions. *See id.*; N.C. Const. of 1868, art. I, § 8; N.C. Const. of 1776, Declaration of Rights § IV; *see also State ex rel. Wallace v. Bone*, 304 N.C. 591, 595-601, 596 n.2, 286 S.E.2d 79, 81-84, 82 n.2 (1982).

Although the text of the separation of powers clause has changed very little since 1776, the powers that the current constitution allocates to the legislative and executive branches have changed significantly. In particular, the General Assembly lost the power to appoint the Governor in 1835, *see* N.C. Const. of 1776, Amends. of 1835, art. II, § 1; lost the power to appoint the Council of State in 1868, *see* N.C. Const. of 1868, art. III, §§ 1, 14; and has never regained the full scope of appointment power that it had in 1776. And unlike the Constitution of 1776, our subsequent state constitutions have given the Governor the duty to take care that the laws are faithfully executed. *See* N.C. Const. art. III, § 5(4); N.C. Const. of 1868, art. III, § 7. Because the "powers" that must be kept "forever separate and distinct from each other," N.C. Const. art. I, § 6, are different in the current constitution than they were

in the original constitution, the separation of powers clause applies differently as well.

The clearest violation of the separation of powers clause occurs when one branch exercises power that the constitution vests exclusively in another branch. *See Houston v. Bogle*, 32 N.C. 496, 503-04 (1849). Other violations are more nuanced, such as when the actions of one branch prevent another branch from performing its constitutional duties. *See Bacon v. Lee*, 353 N.C. 696, 715, 549 S.E.2d 840, 853, *cert. denied*, 533 U.S. 975 (2001). When we assess a separation of powers challenge that implicates the Governor's constitutional authority, we must determine whether the actions of a coordinate branch "unreasonably disrupt a core power of the executive." *Id.* at 717, 549 S.E.2d at 854; *see also In re Alamance Cty. Ct. Facils.*, 329 N.C. 84, 100-01, 405 S.E.2d 125, 133 (1991) (stating that one branch "must minimize the encroachment" on another branch "in appearance and in fact"). As part of the inquiry in this case, we must also consider whether the General Assembly has "retain[ed] some control" over the executive branch's functions. *Wallace*, 304 N.C. at 608, 286 S.E.2d at 88.

In the current constitution, Article III, Section 5(4) gives the Governor the duty to "take care that the laws be faithfully executed." The challenged legislation implicates this constitutional duty because, as the three-judge panel correctly observed, all three commissions "are primarily administrative or executive in character," and because they have final authority over executive branch decisions.

*See* N.C.G.S. § 130A-309.202(f) (authorizing the Coal Ash Management Commission to overrule DENR classifications and closure plans for coal ash surface impoundments); *id.* § 143B-290 (authorizing the Mining Commission to overrule certain permit decisions that DENR makes); *id.* § 143B-293.6(b) (authorizing a committee within the Oil and Gas Commission to remit civil environmental penalties that DENR imposes). In light of the final executive authority that these three commissions possess, the Governor must have enough control over them to perform his constitutional duty.[5]

The degree of control that the Governor has over the three commissions depends on his ability to appoint the commissioners, to supervise their day-to-day activities, and to remove them from office. The legislation that plaintiffs challenge here limits each of these methods of control. It gives the General Assembly the power to appoint a majority of each commission's voting members and gives the Governor only two or three appointees per commission. *See id.* § 130A-309.202(b); *id.* §§ 143B-291(a1), -293.2(a1). It also gives each commission final executive authority

---

[5] Our opinion takes no position on how the separation of powers clause applies to those executive departments that are headed by the independently elected members of the Council of State. *See* N.C. Const. art. III, § 7 (providing for the election of the Secretary of State, Auditor, Treasurer, Superintendent of Public Instruction, Attorney General, Commissioner of Labor, Commissioner of Agriculture, and Commissioner of Insurance). The facts of this case concern DENR, which unquestionably falls under the Governor's purview. *See* N.C.G.S. § 143B-6(6) (2013) (identifying DENR as a principal department); *id.* § 143B-9 (2013) ("The head of each principal State department, except those departments headed by popularly elected officers, shall be appointed by the Governor and serve at his pleasure.").

over certain DENR decisions, sapping the power of a principal administrative department over which the Governor has greater control. *See id.* § 130A-309.202(f); *id.* §§ 143B-290(1)(c), -293.6; *see also id.* §§ 143B-9, -6(6). It insulates the Coal Ash Management Commission from executive branch control even more by requiring the commission to exercise its powers and duties "independently," without the "supervision, direction, or control" of the Division of Emergency Management or the Department of Public Safety. *Id.* § 130A-309.202(n). And the challenged legislation sharply constrains the Governor's power to remove members of any of the three commissions, allowing him to do so only for cause. *Id.* § 130A-309.202(e); *id.* §§ 143B-291(d), -293.2(c)(1).

We cannot adopt a categorical rule that would resolve every separation of powers challenge to the legislative appointment of executive officers. Because each statutory scheme will vary the degree of control that legislative appointment provisions confer on the General Assembly, we must resolve each challenge by carefully examining its specific factual and legal context. While the General Assembly's ability to appoint an officer obviously does not give it the power to control what that officer does, we must examine the degree of control that the challenged legislation allows the General Assembly to exert over the execution of the laws.

Using that approach here, we hold that the challenged appointment provisions violate the separation of powers clause. When the General Assembly appoints executive officers that the Governor has little power to remove, it can appoint them

essentially without the Governor's influence. That leaves the Governor with little control over the views and priorities of the officers that the General Assembly appoints. When those officers form a majority on a commission that has the final say on how to execute the laws, the General Assembly, not the Governor, can exert most of the control over the executive policy that is implemented in any area of the law that the commission regulates. As a result, the Governor cannot take care that the laws are faithfully executed in that area. The separation of powers clause plainly and clearly does not allow the General Assembly to take this much control over the execution of the laws from the Governor and lodge it with itself. *See Bacon,* 353 N.C. at 717-18, 549 S.E.2d at 854; *Wallace,* 304 N.C. at 608, 286 S.E.2d at 88; *see also* N.C. Const. art. III, § 5(4).[6]

Under the rule that defendants advance, the General Assembly could appoint every statutory officer to every administrative body, even those with final executive authority, and could prohibit the Governor from having any power to remove those

---

[6] Because we hold that the challenged appointment provisions violate the separation of powers clause, we can no longer address plaintiffs' separate claim that the Coal Ash Management Commission's statutory mandate to act "independently" of the Division of Emergency Management and the Department of Public Safety violates that clause as well. The facts that existed when plaintiffs brought their claim—namely, that the Coal Ash Management Commission has final executive authority, that the Governor has limited removal power, *and* that the General Assembly appoints a majority of its voting members— no longer exist now that the challenged appointment provisions have been invalidated. As a result, plaintiffs' claim under the current statutory scheme is moot. We therefore vacate the portion of the three-judge panel's decision that held N.C.G.S. § 130A-309.202(n) unconstitutional.

officers. This rule would nullify the separation of powers clause, at least as it pertained to the General Assembly's ability to control the executive branch.

Our appointment cases do not embrace defendants' proposed rule. Many do not even involve separation of powers challenges. *See, e.g.*, *Salisbury*, 167 N.C. at 227, 83 S.E. at 355 (interpreting two statutes to determine that the Governor's recess appointment without Senate confirmation was valid only until the Senate reconvened and confirmed a new appointee); *Cherry*, 124 N.C. at 764-65, 33 S.E. at 137 (concluding that the "keeper of the capitol" was outside the scope of the appointments clause because it was not a constitutional office); *Ewart*, 116 N.C. at 573-74, 21 S.E. at 788 (determining that the General Assembly's creation of a new office did not create a "vacancy" in that office).

Those appointment cases that do involve separation of powers challenges do not establish the proposed rule either. *State ex rel. Martin v. Melott* does not supply a majority rationale that supports its judgment, so it does not establish any separation of powers rule at all. *Compare* 320 N.C. 518, 523-24, 359 S.E.2d 783, 786-87 (1987) (plurality opinion), *with id.* at 525-28, 359 S.E.2d at 788-89 (Meyer, J., concurring). In *Trustees of the University of North Carolina v. McIver*, where there was a clear majority, this Court held that the General Assembly could elect trustees of the University of North Carolina. There, a constitutional amendment separate from the appointments clause gave the General Assembly the "unlimited power" to determine who would elect the trustees. 72 N.C. at 83-85. The Court concluded that

this absolute discretion necessarily gave the General Assembly the power to elect them itself. *See id.* at 81-87. But that holding has no effect on this case because the constitutional provision in question—which pertained only to the University of North Carolina and its trustees—does not apply here. In *Cunningham v. Sprinkle*, a constitutional amendment that directed the General Assembly to establish the Department of Agriculture likewise gave the General Assembly "the largest latitude of regulation" in establishing that department. 124 N.C. at 641-42, 33 S.E. at 139. The provision in *Cunningham* also does not apply here.

Notably, *Cunningham* and *McIver* both conclude that appointing statutory officers is not an exclusively executive prerogative. *See Cunningham*, 124 N.C. at 643, 33 S.E. at 139; *McIver*, 72 N.C. at 85. We agree, and do not deny that the General Assembly may generally appoint statutory officers to administrative commissions.[7] We merely deny that it may appoint them in every instance and under all circumstances.

## III

"A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty," N.C. Const. art. I, § 35, and "the principle of

---

[7] As a corollary, the General Assembly may have broader latitude than it does here when it appoints members to commissions whose functions are different from those of the commissions in the present case, such as the Rules Review Commission. *See* N.C.G.S. § 143B-30.1; *id.* §§ 150B-2(1d), -21.1 to -21.14 (2013).

separation of powers is a cornerstone of our state and federal governments," *Wallace*, 304 N.C. at 601, 286 S.E.2d at 84. The appointments clause does not prohibit the General Assembly from appointing statutory officers, and the General Assembly can appoint them in many instances. But the challenged appointment provisions, in their statutory context, prevent the Governor from performing his constitutional duty to take care that the laws are faithfully executed. By doing so, these provisions violate the separation of powers clause.

We therefore modify and affirm the decision of the three-judge superior court panel in part and vacate it in part.

MODIFIED AND AFFIRMED IN PART; VACATED IN PART.


Justice NEWBY concurring part and dissenting in part.

This case presents the issue of whether the General Assembly has the constitutional power to fill a majority of positions on executive commissions it creates. Unlike the Federal Constitution, the state constitution is not an express grant of power but a limitation on power. All power not expressly granted to the federal government or limited by the constitution resides in the people and is exercised through the General Assembly. Since our original Constitution of 1776, except for a short time by explicit limitation, the General Assembly has had the constitutional authority to provide for the filling of statutory executive positions it creates. As an

exercise of the General Assembly's lawmaking power, this appointment authority, both constitutionally prescribed and jurisprudentially recognized, does not implicate separation of powers because under our jurisprudence the authority to appoint the official has never been deemed the power to control the appointee. Our state's constitutional text and history and this Court's precedent demonstrate that when the legislature statutorily enables itself to select the official, it is simply filling the position and not controlling the appointee.[8] Because the statutes at issue here are constitutional, I must respectfully dissent in part.

The idea of one branch of government, the judiciary, preventing another branch of government, the legislature, through which the people act, from exercising its power is the most serious of judicial considerations. *See Hoke v. Henderson*, 15 N.C. (4 Dev.) 1, 8 (1833) ("[T]he exercise of [judicial review] is the gravest duty of a judge, and is always, as it ought to be, the result of the most careful, cautious, and anxious deliberation."), *overruled in part on other grounds by Mial v. Ellington*, 134 N.C. 131, 162, 46 S.E. 961, 971 (1903); *Trs. of Univ. of N.C. v. Foy*, 5 N.C. (1 Mur.) 58,

---

[8] "The true test is, where does the [state] Constitution lodge the power of electing the various public agents of the government . . . ." *Cunningham v. Sprinkle*, 124 N.C. 638, 642, 33 S.E. 138, 139 (1899) (quoting *Trs. of Univ. of N.C. v. McIver*, 72 N.C. 76, 85 (1875)). This precise question was asked and answered by this Court over 131 years ago. In rejecting the argument that the General Assembly violated separation of powers by exercising appointment authority over executive statutory offices, this Court stated that "a mode of filling the offices created by law" is the prerogative of the General Assembly, acknowledging that filling the position is not exercising the power of the position. *Id.* at 642-43, 33 S.E. at 139. (Of note, many of the older opinions referenced in this opinion use the term "selection" when referring to a single appointing authority, such as the Governor, and "election" when referring to multiple decisionmakers, such as the General Assembly.)

89 (1805)[9] (Hall, J., dissenting) ("A question of more importance than that arising in this case [the constitutionality of a legislative act] cannot come before a court. . . . [W]ell convinced, indeed, ought one person to be of another's error of judgment . . . when he reflects that each has given the same pledges to support the Constitution."). Since its inception, the judicial branch has exercised its implied constitutional power of judicial review with "great reluctance," *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6 (1787), recognizing that when it strikes down an act of the General Assembly, the Court is preventing an act of the people themselves, *see Baker v. Martin*, 330 N.C. 331, 336-37, 410 S.E.2d 887, 890 (1991).

All political power resides in the people, N.C. Const. art. I, § 2, and the people act through the General Assembly, *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895) ("[T]he sovereign power resides with the people and is exercised by their representatives in the General Assembly."). Unlike the Federal Constitution, "a State Constitution is in no matter a grant of power. All power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it." *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961) (quoting *Lassiter v. Northampton Cty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd*, 360 U.S. 45, 79 S.

---

[9] The Court of Conference was the predecessor of this Court, which was statutorily established in 1818. Walter Clark, *History of the Supreme Court of North Carolina*, *in* 177 N.C. 616, 619-20 (1919); *see also Benzien's Ex'rs v. Lenoir*, 11 N.C. (4 Hawks) 403, 406 (1826) (noting "[t]he act of 1818, New Rev., ch. 962, constituting the present Supreme Court" and discussing the Court of Conference).

*NEWBY, J., concurring part and dissenting in part*

Ct. 985, 3 L. Ed. 2d 1072 (1959)); *see also Jones*, 116 N.C. at 570-71, 21 S.E. at 787 ("The only limitation upon this power is found in the organic law, as declared by the delegates of the people in convention assembled from time to time."). The presumptive constitutional power of the General Assembly to act is consistent with the principle that a restriction on the General Assembly is in fact a restriction on the people. *Baker*, 330 N.C. at 336, 410 S.E.2d at 890 ("[G]reat deference will be paid to acts of the legislature—the agent of the people for enacting laws." (quoting *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989))). Thus, this Court presumes that legislation is constitutional, and a constitutional limitation upon the General Assembly must be express and demonstrated beyond a reasonable doubt. *E.g., Hart v. State*, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).

This rigorous standard for constitutional challenges ensures uniformity and predictability in the application of our constitution. *State v. Emery*, 224 N.C. 581, 584, 31 S.E.2d 858, 861 (1944) ("[Constitutions] should receive a consistent and uniform construction . . . even though circumstances may have so changed as to render a different construction desirable." (citing, *inter alia, State ex rel. Att'y-Gen. v. Knight*, 169 N.C. 333, 85 S.E. 418 (1915))); *see also Bacon v. Lee*, 353 N.C. 696, 712, 549 S.E.2d 840, 851-52 ("A primary goal of adjudicatory proceedings is the uniform application of law. In furtherance of this objective, courts generally consider themselves bound by prior precedent, *i.e.*, the doctrine of *stare decisis*." (citations omitted)), *cert. denied*, 533 U.S. 975, 122 S. Ct. 22, 150 L. Ed. 2d 804 (2001). Adhering

to this fixed standard ensures that we remain true to the rule of law, the consistent interpretation and application of the law. *State v. Bell*, 184 N.C. 701, 720, 115 S.E. 190, 199 (1922) (Stacy, J., dissenting) ("[T]here must be some uniformity in judicial decisions . . . or else the law itself, the very chart by which we are sailing, will become as unstable and uncertain as the shifting sands of the sea . . . .").

Under a proper application of these foundational principles, the constitutional challenge here cannot surmount the high bar imposed by the presumption of constitutionality given to legislative acts. A clear understanding of the constitutionally prescribed powers and their division among the branches of government is a basis for stability and cooperation within government. Because that stability instills public confidence in governmental actions, this Court should follow its time-honored approach in assessing the powers conferred upon each branch of government and applying separation of powers principles.

Since 1776 our constitutions have expressly vested the vast legislative power, the power to make laws, in two distinct chambers of the General Assembly, the Senate and the House of Representatives. N.C. Const. art. II, § 1; N.C. Const. of 1868, art. II, § 1; N.C. Const. of 1776, § I; *see also Legislative Power*, Black's Law Dictionary (10th ed. 2014) ("The power to make laws and to alter them; a legislative body's exclusive authority to make, amend, and repeal laws."). This express power to make laws is broad and has not changed; it is limited only as expressly forbidden by the constitution and by federal law. *McIntyre*, 254 N.C. at 515, 119 S.E.2d at 891-92;

*NEWBY, J., concurring part and dissenting in part*

*Jones*, 116 N.C. at 570-71, 21 S.E. at 787; *see, e.g., Bayard*, 1 N.C. (Mart.) at 7 (declaring an act of the General Assembly unconstitutional because it violated the constitutional right to a trial by jury); *see also Dickson v. Rucho*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2015) (recognizing restriction of state legislative power by federal law).

In addition to federal limitations on state legislative power, the state constitution provides express restrictions safeguarding against an abuse of legislative power. *See, e.g.*, N.C. Const. art. II, § 23 (prescribing the procedure for the passing of revenue bills); *id.* art. II, § 24 (limiting certain local, private, or special acts); *id.* art. III, § 5(11) (limiting "reconvened sessions" to considering certain bills); *id.* art. IV, § 1 (limiting authority to establish certain courts or to deprive courts of jurisdiction "that rightfully pertains to [the courts] as a co-ordinate department of the government"); *id.* art. V, §§ 1, 2(1)-(7) (limiting taxing authority); *id.* art. V, § 3(1)-(2), 4 (limiting authority regarding debt); *id.* art. VI, § 9 (preventing the appointment of an official already serving in one branch to serve simultaneously in another branch).[10]

---

[10] Every one of our state constitutions has placed express limitations or prohibitions on legislative power. *See, e.g.*, N.C. Const. of 1868, art. I; *id.*, art II, §§ 13, 14 (prohibiting the passing of certain private laws and providing a procedure by which to pass permissible private laws); *id.*, art. II, § 16 (prescribing the procedure for passing laws regarding state debt or credit); N.C. Const. of 1776, Declaration of Rights, § III (prohibiting "exclusive or separate emoluments or privileges," except for "in consideration of public services"); *id.*, Declaration of Rights, § XII (prohibiting seizure of person and "freehold liberties or privileges" and deprivation of "life, liberty, or property, but by the law of the land"); *id.*, Declaration of Rights, § XIV (prohibiting the suspension of trial by jury); *id.*, Declaration of Rights, § XXII (prohibiting "hereditary emoluments, privileges or honors").

*NEWBY, J., concurring part and dissenting in part*

Moreover, the General Assembly is checked and balanced by its structure and its accountability to the people. *See* N.C. Const. art. I, § 2. Legislative power is divided between two chambers,[11] with its combined one hundred seventy members. *Id.* art. II, §§ 2, 4 (providing for 50 senators and 120 representatives). The members of each chamber serve different constituencies with various needs and priorities. *Id.* art. II, §§ 3, 5. The General Assembly's power is diffused by its sheer magnitude, its diversity within each chamber, and, consequently, the need to find compromise. *See* 1 James Bryce, *The American Commonwealth* 480 (3d ed. 1901) ("The Americans restrain their legislatures by dividing them . . . ."). History has shown that the legislative branch is not a continuously cohesive force; disagreements between the two chambers are not infrequent.[12] The diversity within the branch, however, ensures healthy review and significant debate of each proposed statute, the enactment of which frequently reaches final form through compromise. Likewise,

---

[11] Our constitution has even referred to the division of legislative power between the bicameral houses as "distinct branches" of government. N.C. Const. of 1868, art. II, § 1; N.C. Const. of 1776, § I.

[12] Notably, the statutes in question here do not provide for appointments by the "General Assembly" but instead distribute legislative appointments between the Senate and the House of Representatives. *See* Act of June 4, 2014, ch. 4, § 4(a), 2014 N.C. Sess. Laws 57, 61 (providing that the Oil and Gas Commission consists of nine members: three selected by the House, three by the Senate, and three by the Governor); *id.* § 5(a), 2014 N.C. Sess. Laws at 64-65 (providing that the Mining Commission consists of eight members: two selected by the House, two by the Senate, two by the Governor, along with the State Geologist and the chair of the North Carolina State University Minerals Research Laboratory Advisory Committee); Act of Sept. 20, 2014, ch. 122, § 3(a), 2014 N.C. Sess. Laws 828, 832 (providing that the Coal Ash Management Commission consists of nine members: three selected by the House, three by the Senate, and three by the Governor).

*NEWBY, J., concurring part and dissenting in part*

members of the legislative branch face the most frequent elections, serving only two-year terms,[13] N.C. Const. art. II, §§ 2, 4, and are thereby most directly accountable to the people. Lawmakers represent the particular interests of their different constituents, who are limited in number. *Id.* art. II, §§ 3, 5. In addition to these structural safeguards, the final check on the legislative power of the General Assembly is judicial review, the implied constitutional authority of the court to decide if a law violates the constitution. *See Bayard*, 1 N.C. (Mart.) at 6-7; *see generally Hoke*, 15 N.C. (4 Dev.) at 28 (observing that the constitution "guards against abuse" of legislative power through "frequent elections," protection of individual rights, division of powers, and judicial review).

This broad constitutional power to make laws includes the indisputable authority of the General Assembly to create executive statutory offices. Along with the power to create the office, the legislature has the power to assign the selection authority either to itself or another. *See, e.g., State ex rel. Martin v. Melott,* 320 N.C. 518, 520, 524, 528, 359 S.E.2d 783, 785, 787, 789 (1987) (plurality) (stating, with one dissenting judge agreeing, that the General Assembly had the constitutional power to appoint the position itself); *State ex rel. Cherry v. Burns*, 124 N.C. 761, 765, 33 S.E. 136, 137 (1899) (concluding that the constitution "leads us to the opinion that the Legislature may fill this [statutory] office" (citations omitted)); *Cunningham v.*

---

[13] The terms for legislators were lengthened from one to two years by amendment in 1835. N.C. Const. of 1776, art. I, § 1 (1835).

*NEWBY, J., concurring part and dissenting in part*

*Sprinkle*, 124 N.C. 638, 641, 33 S.E. 138, 139 (1899) ("[B]eing of legislative creation," appointments of members of the Board of Agriculture "are equally within the power of legislative appointment."); *State Prison v. Day*, 124 N.C. 362, 367, 32 S.E. 748, 749 (1899) (concluding that the constitution intended "to confer upon the General Assembly the power to fill offices created by statute"), *abrogated on other grounds by State ex rel. Salisbury v. Croom*, 167 N.C. 223, 228, 83 S.E. 354, 356 (1914); *Jones*, 116 N.C. at 574, 21 S.E. at 788 ("Here, the Legislature had the constitutional power to create the office and fill it . . . .").

The only express constitutional limitation on statutory appointments forbids any member of one branch from serving simultaneously in another branch of government; however, that prohibition does not speak to who has the authority to appoint. N.C. Const. art. VI, § 9; N.C. Const. of 1868, art. XIV, § 7 (1873); N.C. Const. of 1776, art. IV, § 4 (1835); N.C. Const. of 1776, §§ XXVI-XXX; *see also State ex rel. Wallace v. Bone*, 304 N.C. 591, 608-09, 286 S.E.2d 79, 88-89 (1982) (concluding that, if an appointing authority appoints an official from one branch to an official role in another branch, that official unconstitutionally exercises the power of two branches). There is no constitutional limitation on the General Assembly's designating itself as the appointing authority of positions it creates by statute.

The people have retained for themselves alone the only constitutional method of changing the powers of each of the branches: the constitutional amendment. As discussed below, for only an eight-year period, the people limited the General

*NEWBY, J., concurring part and dissenting in part*

Assembly's power to designate the appointing authority for statutory offices. Thereafter, the people expressly removed any such limitation. Most recently, the people modified the legislative power by passing a constitutional amendment granting the Governor the power to veto certain legislation. *See* Act of March 8, 1995, ch. 5, §§ 3, 4, 1995 N.C. Sess. Laws 6, 8 (establishing referendum to amend the constitution to provide gubernatorial veto to take effect 1 January 1997). A gubernatorial veto requires a three-fifths vote in each chamber to override. N.C. Const. art II, § 22. Thus, legislative power remains broad, limited only by express constitutional provision.

Unlike the unified executive present in the federal model, the state constitution has never had a unified executive; rather, executive power is dispersed among several specified constitutional executive officers, with the Governor being chief among them. N.C. Const. art. III, §§ 1, 7; N.C. Const. of 1868, art. III, § 1; N.C. Const. of 1776, §§ XIV, XIX. The 1776 constitution, like every constitution thereafter, placed the general executive power in the Governor. N.C. Const. art. III, § 1; N.C. Const. of 1868, art. III, § 1, 4; N.C. Const. of 1776, § XIX. This constitution vested the Governor with the power to "exercise all the other executive powers of government, limited and restrained as by this Constitution [as] mentioned, and according to the laws of the State." N.C. Const. of 1776, § XIX; *see also Executive Power*, Black's Law Dictionary (10th ed. 2014) ("The power to see that the laws are duly executed and enforced. . . . [G]overnors' executive powers are provided for in

*NEWBY, J., concurring part and dissenting in part*

state constitutions."). This original constitution, like each constitution thereafter, also provided specific gubernatorial duties. *E.g.*, N.C. Const. art. III, § 5 (outlining the "Duties of Governor"); N.C. Const. of 1868, art. III, § 6 ("to grant reprieves commutations and pardons"); *id.*, art. III, § 9 ("to convene the General Assembly in extra session"); N.C. Const. of 1776, § XIX (including the "power to draw for and apply such sums of money as shall be voted by the general assembly" and to exercise clemency, "the power of granting pardons and reprieves").

The 1776 constitution, like those that followed, divided the executive responsibilities between the Governor and others, including a Council of State, even though the Governor was expressly given the general executive authority and responsibility. N.C. Const. of 1776, § XIX. This model of diffused executive power, with the Governor exercising the general executive power, was unchanged in the 1868 state constitution. *Compare id.* § XIX ("[Governor] may exercise all . . . executive powers of government . . . ."), *with* N.C. Const. of 1868, art. III, § 1 ("[Governor] shall be vested [with] the Supreme executive power . . . ."). Stylistically improved, the 1868 constitution implemented separate articles for each branch, including the first constitutional establishment of the judicial branch. *See* N.C. Const. of 1868, arts. II-IV. The use of separate articles provided for more detailed descriptions of the workings of each branch. John V. Orth & Paul Martin Newby, *The North Carolina*

*NEWBY, J., concurring part and dissenting in part*

*State Constitution* 19-20 (2d ed. 2013) [hereinafter *State Constitution*].[14] As in the past, to enable the Governor to fulfill his supervisory role, the 1868 constitution authorized the Governor to gather information from the other executive branch officers and report to the General Assembly. N.C. Const. of 1868, art. III, § 7. In summarizing this supervisory role, this provision states: "[The Governor] shall take care that the laws be faithfully executed." *Id.* This phrase did not expand the Governor's powers but stated more explicitly this general supervisory aspect of the Governor's executive responsibilities in a multimember executive branch.

In other words, the constitution charged the Governor with supervising the executive branch and its functions while, at the same time, granting certain executive powers to other executive officers. *E.g., id.*, art. III, § 1 (listing Governor as one of eight elected offices in the executive branch); *id.*, art. III, § 7 ("The officers of the Executive Department . . . shall . . . severally report to the Governor, who shall transmit such reports, with his message, to the General Assembly . . . ."); *id.*, art. III, § 9 (authorizing the Governor to "convene the General Assembly in extra session" "by

---

[14] Professor John V. Orth is a legal historian and state constitutional scholar acknowledged and cited by both this Court and the United States Supreme Court. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 108, 120, 116 S. Ct. 1114, 1149, 1155, 134 L. Ed. 2d 252, 299, 306 (1996) (Souter, Ginsburg & Breyer, JJ., dissenting); *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 499, 510 n.16, 520 n.20, 107 S. Ct. 2941, 2959, 2965 n.16, 2970 n.20, 97 L. Ed. 2d 389, 413, 420 n.16, 426 n.20 (1987) (Brennan, Marshall, Blackmun & Stevens, JJ., dissenting); *Hoke Cty. Bd. of Educ. v. State*, 358 N.C. 605, 648, 599 S.E.2d 365, 397 (2004) (quoting and citing John V. Orth, *The North Carolina State Constitution: A Reference Guide* (1993)); *Stephenson v. Bartlett*, 355 N.C. 354, 367, 562 S.E.2d 377, 387 (2002) (referring to Orth as "a highly respected state constitutional scholar").

and with the advice of the Council of State"); *id.*, art. III, § 13 ("The respective duties of the [constitutional executive officers] shall be prescribed by law."); *id.*, art. III, § 14 ("The Secretary of State, Auditor, Treasurer, Superintendent of Public Works, and Superintendent of Public Instruction, shall constitute *ex officio*, the Council of State, who shall advise the Governor in the execution of his office . . . ."). The constitution allowed the General Assembly to assign executive duties and functions by statute. *Id.*, art. III, § 13. Thus, while the Governor had general supervisory responsibility, *id.*, art. III, §§ 1, 7, each constitutional executive officer was primarily responsible for executing the laws assigned to that official by the General Assembly, *id.*, art. III, § 13.

The executive branch is fundamentally unchanged under the current constitution. The Governor continues to share the exercise of executive powers with the other constitutional executive officers who are separately elected members of the Council of State, N.C. Const. art. III, §§ 7(1)-(2), 8, while maintaining his supervisory role, *id.* art. III, §§ 1, 5(4), notwithstanding possible conflict among these officials, *see* N.C.G.S. § 147-17 (2013) (allowing the Governor to employ independent counsel). The constitution continues to require the General Assembly to assign by statute executive duties and functions to the constitutional executive officers and the administrative departments. N.C. Const. art. III, § 5(10) ("The General Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time . . . ."); *id.* art. III, § 7(2) ("[R]espective duties [of the Council of State] shall be prescribed by law."); *id.* art. III, § 11 ("[A]ll

*NEWBY, J., concurring part and dissenting in part*

administrative departments, agencies, and offices of the State and their respective functions, powers, and duties shall be allocated by law . . . .").

In addition to prescribing duties to the executive officers, our current constitution expressly recognizes the General Assembly's power to organize and reorganize the executive branch. *Id.* art. III, § 5(10) ("The General Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time . . . ."); *see id.* art. III, § 11 ("Regulatory, quasi-judicial, and temporary agencies may, but need not, be allocated within a principal department."). Thus, the executive power remains diffused and unchanged. *Compare* N.C. Const. of 1868, art. III, *with* N.C. Const. art. III. When the people have desired to expand executive authority, they have done so through express constitutional change. Such change occurred in the 1868 constitution, though it proved to be short-lived.

The Constitution of 1868, through a controversial provision, expressly limited the General Assembly's constitutional authority to assign the selection of statutory officers, expressly granting the appointment authority to the Governor, subject to consent of the Senate:

> The Governor shall nominate, and by and with the advice and consent of a majority of the Senators elect, appoint, all officers whose offices are established by this Constitution, or which shall be created by law, and whose appointments are not otherwise provided for, and no such officer shall be appointed or elected by the General Assembly.

*NEWBY, J., concurring part and dissenting in part*

N.C. Const. of 1868, art. III, § 10. Notably, a specific constitutional provision was required to limit the General Assembly's lawmaking power and to prevent it from designating an appointing authority other than the Governor.

Eight years later, the people specifically repealed this limitation on the General Assembly's legislative power by constitutional amendment in 1876. The amendment "restore[d] in considerable measure the former power of the General Assembly." Thad Eure, Sec'y of State, *North Carolina Government 1585-1974* at 798 (John L. Cheney, Jr. ed., 1975). Thereafter, the explicit constitutional power to designate the appointing authority, including the authority to designate itself, again resided in the General Assembly. *See* N.C. Const. of 1868, art. III, § 10 (1876); *Day*, 124 N.C. at 367, 32 S.E. at 749 ("[I]t is clear that the [Constitutional] Convention of 1875 intended to alter the Constitution . . . to confer upon the General Assembly the power to fill offices created by statute." (citation omitted)); *Jones*, 116 N.C. at 572-73, 21 S.E. at 788 ("[T]he [Constitutional] Convention refused to incorporate the words 'and no such officer shall be appointed or elected by the General Assembly.' " (citing Convention Journal of 1875, at 175-76)); *see, e.g.*, *Burns*, 124 N.C. at 765, 33 S.E. at 137 ("[T]he Legislature may fill [the] office [of keeper of the capitol].").); *Cunningham*, 124 N.C. at 641, 33 S.E. at 139 ("[M]embers of the Board of Agriculture . . . being of legislative creation, . . . are equally within the power of legislative appointment.").[15]

---

[15] *See State Constitution* 25 ("[T]he General Assembly now reclaimed the power to provide for legislative appointments to executive offices created by statute."). In 1911 two

*NEWBY, J., concurring part and dissenting in part*

Since this fundamental return to the historical status quo, the constitutional authority to provide the method of filling statutory offices resides squarely with the General Assembly; the relevant provisions of our constitution regarding legislative power have remained unchanged. N.C. Const. art. II, § 1; *see id.* art. III, §§ 5(8), (10), 11. In 1968 the North Carolina State Constitution Study Commission acknowledged this broad legislative power. The Study Commission was tasked with drafting and proposing amendments to our current constitution. *See* N.C. State Constitution Study Comm'n, *Report of the North Carolina State Constitution Study Commission* i-ii (1968) [hereinafter *Report*]. The Study Commission reviewed our constitution and transmitted a special report to the Governor and General Assembly, which would serve "as the primary source of guidance for the 1969 legislative session" and adoption of our current constitution. *N.C. State Bar v. DuMont*, 304 N.C. 627, 635, 286 S.E.2d 89, 94 (1982). As we noted,

> a comparison . . . reveals that our Legislature relied almost
> exclusively on the Report. Hence, a close study of the

of the foremost legal scholars in North Carolina, Henry G. Conner, a former Supreme Court Justice, then serving as a federal district court judge, and Joseph B. Cheshire, Jr., an attorney in Raleigh, North Carolina, published an annotation of the state constitution. Henry G. Connor & Joseph B. Cheshire, Jr., *The Constitution of the State of North Carolina Annotated* i (1911). They stated that "the amendment to this section by the Convention of 1875 altered the Constitution as construed [previously] . . . and conferred upon the General Assembly the power to fill offices created by statute." *Id.* at 140. This Court has quoted and cited this valuable work on our state constitution throughout the past century. *See, e.g.*, *Coley v. State*, 360 N.C. 493, 497, 631 S.E.2d 121, 125 (2006); *State v. Furmage*, 250 N.C. 616, 618, 109 S.E.2d 563, 564-65 (1959); *Penny v. Salmon*, 217 N.C. 276, 279, 7 S.E.2d 559, 561 (1940); *Moose v. Bd. of Comm'rs*, 172 N.C. 419, 441-42, 90 S.E. 441, 452 (1916) (Brown, J., concurring).

*NEWBY, J., concurring part and dissenting in part*

> Report allows us "to place [ourselves] as nearly as possible
> in the position of the men who framed the instrument" and
> allows us to "look to the history [and] general spirit of the
> times" . . . .

*Id.* at 635, 286 S.E.2d at 94 (brackets in original) (quoting *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953) ("The court should place itself as nearly as possible in the position of the men who framed the instrument.")).

In its report the Study Commission explained:

> The General Assembly will not be deprived of any of its
> present authority over the structure and organization of
> state government. It retains the power to make changes
> on its own initiative, it can disapprove any change initiated
> by the Governor, and it can alter any reorganization plan
> which it has allowed to take effect and then finds to be
> working unsatisfactorily.

*Report* at 131-32; *see also* N.C. Const. art. III, §§ 5(10), 11. Moreover, the Study Commission recommended limiting legislative appointment authority by constitutional amendment. Its proposed amendment would have vested sole authority in the Governor to "appoint and [ ] remove the heads of all administrative departments and agencies." *Report* at 113. This proposed constitutional amendment, modestly limiting some legislative appointment authority, was not adopted, thus perserving for the General Assembly its historically broad appointment authority. *See* N.C. Const. art. III, § 7.

Thus, aside from a short-lived express limitation, the constitutional authority to designate the appointing authority for statutory positions has resided and continues to reside squarely in the General Assembly under its general legislative

power to make laws. Therefore, not only does the General Assembly have the undisputed constitutional power to create positions in the other branches, it may also designate to itself the authority to fill the positions.

Since 1776 our state constitutions have contained a separation of powers provision stating "[t]hat the legislative, executive, and supreme judicial powers of government, ought[16] to be forever separate and distinct from each other." N.C. Const. of 1776, Declaration of Rights, § IV; *see* N.C. Const. art. I, § 6; N.C. Const. of 1868, art. I, § 8. Notably, the plain language of the provision states that "powers" are to be "separate and distinct." A violation of separation of powers occurs when one branch of government exercises the power reserved for another branch of government.[17]

---

[16] Even though the word "ought" in both the 1776 and 1868 constitutions was changed to "shall" in the 1971 constitution, the Study Commission noted there was no substantive change to the separation of powers clause. *Report* at 73-75; *see also Smith v. Campbell*, 10 N.C (3 Hawks) 590, 591, 598 (1825) (providing that "ought" is synonymous with "shall," noting that "the word *ought*, in this and other sections of the [1776 constitution], should be understood imperatively").

[17] This Court has consistently recognized this application of the separation of powers principle. *See, e.g.*, *State v. Whitehead*, 365 N.C. 444, 448-49, 448 n.1, 722 S.E.2d 492, 496 & n.2 (2012) (providing that the judiciary cannot exercise executive power under N.C. Const. art. III, § 5(6) to invalidate sentence for nonlegal error); *Bacon*, 353 N.C. at 717-18, 722, 549 S.E.2d at 854-55, 857 (recognizing that the judiciary cannot impose additional constraints on the executive's "exclusive prerogative" to grant clemency under N.C. Const. art. III, § 5(6)); *Hogan v. Cone Mills Corp.*, 315 N.C. 127, 138-40, 142-43, 337 S.E.2d 477, 483-44, 486 (1985) (holding the legislature cannot exercise judicial power extended to the Industrial Commission under the Worker's Compensation Act by retroactively altering a judgment rendered by that agency); *State v. Elam*, 302 N.C. 157, 160, 273 S.E.2d 661, 664 (1981) (holding the General Assembly cannot exercise constitutional power granted to the judiciary under N.C. Const. art. IV, § 13(2) in making rules of appellate practice and

*NEWBY, J., concurring part and dissenting in part*

The first case in which this Court[18] addressed separation of powers, decided less than fifty years after the adoption of the original constitution, arose in a land title dispute. In *Robinson v. Barfield* the General Assembly passed a private act attempting to cure a flaw in a deed. 6 N.C. (2 Mur.) 391, 418-19 (1818). The Court said that the General Assembly violated separation of powers by exercising power reserved for the judiciary. *Id.* at 419. The Court noted that in passing the act, the legislature was attempting to determine "the *effects* in *law* of the several deeds. By the Constitution they are restricted from this exercise of power; they are to *make* the law, and the *judicial* power is to expound and determine what cases are within its operation." *Id.*

Similarly, in a more recent case, *Bacon v. Lee,* a convicted criminal asked this Court to intrude into the Governor's clemency review—an explicit constitutional power vested in the Governor since 1776. 353 N.C. at 704, 549 S.E.2d at 846-47. The

procedure); *Person v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 513-14, 115 S.E. 336, 345 (1922) (holding the judiciary cannot invalidate a statute found not in conflict with the exercise of the legislature's constitutional taxation power under N.C. Const. of 1868, art. V, § 3); *Houston v. Bogle*, 32 N.C. (10 Ired.) 496, 503-04 (1849) (holding the legislature cannot exercise judicial power to retroactively determine "what the law is and what it was"); *Hoke*, 15 N.C. (4 Dev.) at 13-15 (holding the General Assembly violates separation of powers by exercising judicial power when it passes a law which attempts to settle a dispute between competing claimant to a public office); *Robinson v. Barfield*, 6 N.C. (2 Mur.) 391, 418-19 (1818) (holding that the legislature cannot exercise judicial power by deciding whether a deed "was executed according to . . . [the] law"); *see also Ivarsson v. Office of Indigent Def. Servs.*, 156 N.C. App. 628, 631, 577 S.E.2d 650, 652 ("A violation of the separation of powers required by the North Carolina Constitution occurs when one branch of state government exercises powers that are reserved for another branch of state government."), *disc. rev. denied*, 357 N.C. 250, 582 S.E.2d 269 (2003).

[18] *See* footnote 2.

criminal defendant sought substantive review from this Court because the then-serving Governor had represented the State during Bacon's appeal. *Id.* at 701-02, 711, 549 S.E.2d at 844-45, 851. This Court concluded that clemency was an explicit constitutional power of the Governor to be exercised solely at the Governor's discretion. *Id.* at 704, 549 S.E.2d at 846-47. As such, clemency was a nonjusticiable, political question. *Id.* at 716-17, 549 S.E.2d at 854. In explaining nonjusticiability, the Court noted that any substantive review by the Court would interfere with the Governor's express constitutional authority. *Id.* at 716-17, 549 S.E.2d at 854. When one branch interferes with another branch's performance of its constitutional duties, it attempts to exercise a power reserved for the other branch. *Id.* at 721-22, 549 S.E.2d at 857. Therefore, if the Court conducted a substantive review of the clemency proceeding, the judicial branch would be exercising a power constitutionally reserved for the Governor, thus violating separation of powers. *Id.* at 721-22, 549 S.E.2d at 857.

As discussed, the General Assembly has the constitutional power to assign itself the authority to fill statutory positions; this designation does not violate separation of powers. From our founding, the authority to appoint has simply been a mode of filling the position and has not in any way implicated control over the official or an exercise of any official duties. *Cunningham*, 124 N.C. at 642-43, 33 S.E. at 139 (holding that legislative appointment is "only a mode of filling the offices" and that "[t]his view . . . was strictly in accordance with the constitutional history of this

State"); *Jones*, 116 N.C. at 580, 21 S.E. at 790 (Avery, J., concurring) ("[B]efore any such express power was given or limited to the Chief Executive, when by the Constitution as amended in 1835 no express grant of authority to appoint or elect was conferred upon either of the coördinate departments, the residuary power of the people to provide for filling offices, already existing, and to create others, was exercised by their representatives in the General Assembly."); *Trs. of Univ. of N.C. v. McIver*, 72 N.C. 76, 85 (1875) ("Now the election of officers is not an executive, legislative or judicial power, but only a mode of filling the offices created by law, whether they belong to one department or the other. The election of a judge is not a judicial power, nor the election of a Governor an executive power; for if so, all elections by the people would be an infringement upon the executive department.").

If the appointing of the official is simply a mode of filling the position and does not implicate control, then the appointment does not in any manner amount to exercising the duties of the office. Thus, whether appointing an official or a majority of a group of officials, the appointing authority is not exercising any responsibilities of the position. This principle has existed since our independence from Great Britain and has been reiterated throughout our history.

In 1776 the Drafters of the Declaration of Rights in our state constitution provided for separation of powers, N.C. Const. of 1776, Declaration of Rights, § IV; the next day, those same Drafters specified legislative appointment of the entire executive and judicial branches, N.C. Const. of 1776, §§ XIII-XVI, XXII-XXIV. In

*NEWBY, J., concurring part and dissenting in part*

appointing the Governor, the then-seven-member Council of State, an Attorney General, Secretary of State, and Treasurer, *id.*, the General Assembly did not exercise the power of those offices. The authority to appoint all the officials of the other branches did not violate separation of powers because a separation of powers violation only occurs when one branch of government *exercises the power* belonging to another branch. Once appointed, the Governor and other executive branch officials each took an oath to perform the duties of the office and served a designated term. N.C. Const. of 1776, §§ XII, XV, XVI. Similarly, the legislature did not exercise the judicial power by creating a judicial system and appointing and removing judges. *Id.* § XIII. The judges took an oath to perform their duties and did so, despite the possibility of removal. *Id.* §§ XII, XIII.

Our original judges aptly demonstrated that a selected officer exercises independent judgment after appointment, even in the face of the legislature's removal authority. In *Bayard v. Singleton* the three judges had been appointed by the General Assembly and were subject to removal by that body. *See id.* § XIII. Nonetheless, the judges held an act of the General Assembly unconstitutional. 1 N.C. (Mart.) at 7. The Court observed

> that the obligation of their oaths and the duty of their office required them, in that situation, to give their opinion on that important and momentous subject; and that notwithstanding the great reluctance they might feel against involving themselves in a dispute with the Legislature of the State, yet no object of concern or respect could come in competition or authorize them to dispense

*NEWBY, J., concurring part and dissenting in part*

> with the duty they owed the public, in consequence of the trust they were invested with under the solemnity of their oaths.

*Id.* at 6-7. As demonstrated by the behavior of the judges and their decision in *Bayard v. Singleton*, appointment was simply a means of filling the position, not controlling the official and thereby exercising the power of the office.[19]

Our current constitution and a variety of statutes continue to recognize that the authority to appoint an official does not result in control of the appointee; having and exercising such authority does not implicate separation of powers. The constitution and statutes place with one or more officials in one branch the authority to appoint officials in another branch.[20] Moreover, various statutory schemes allow

---

[19] The commissioners appointed under the statutes at issue here likewise must take oaths before taking on the responsibilities of their positions. *See* N.C.G.S. § 11-1 (2013) ("[O]aths . . . are necessary . . . to the important end of good government . . . [and] ought to be taken and administered with the utmost solemnity."); *id.* § 11-7 (2013) ("[E]very person elected or appointed to hold any office . . . shall . . . take and subscribe to the following oath: 'I . . . do solemnly and sincerely swear that I will . . . be faithful and bear true allegiance to the State of North Carolina, and to the constitutional powers and authorities which are or may be established for the government thereof; and that I will endeavor to support, maintain and defend the Constitution of said State . . . .' "); *see also id.* § 143B-13(a) (2013) ("[E]ach member [is appointed] on the basis of interest in public affairs, good judgment, knowledge, and ability in the field for which appointed, and with a view to providing diversity of interest and points of view in the membership.").

[20] *See* N.C.G.S. §§ 7A-752, -753 (Chief Justice makes appointments to the Office of Administrative Hearings, housed in the executive branch); *Melott*, 320 N.C. at 526, 359 S.E.2d at 788 (Meyer, J., concurring in result) (recognizing that the Office of Administrative Hearings exercises judicial functions, yet is housed in the executive branch); *see, e.g.*, N.C. Const. art IV, § 19 (Governor fills judicial vacancies); N.C.G.S. § 163-9(a) (2013) (same); *see also* N.C. Const. art. III, §§ 3(4), (5) (General Assembly determines Governor's mental capacity and has power to impeach); *id.* art. III, § 7(6) (General Assembly determines incapacity of executive officers); N.C.G.S. § 106-2 (2013) (Governor appoints Agriculture Board, housed under elected Council of State member); *id.* §§ 162-5, -5.1 (2013) (vacancy in

*NEWBY, J., concurring part and dissenting in part*

for the branches to share appointments[21] and even authorize the political parties to recommend certain appointees.[22] This historically recognized principle, that appointment is simply a means of filling the position, is true regardless of the function ultimately exercised by the official.[23] Thus, for example, when the Governor appoints a judge, the Governor is not controlling the judge or exercising a judicial power; separation of powers is not implicated. N.C. Const. art. IV, § 19.

The principle of separation of powers is certainly not implicated by the General Assembly's appointment of a majority of the members of various executive commissions, particularly in light of the General Assembly's significant express constitutional authority to assign executive duties to the constitutional executive

---

the office of sheriff, exercising the executive function of enforcing the laws, filled by board of county commissioners, a legislative body).

[21] *See, e.g.,* N.C.G.S. § 7A-375 (2013) (Judicial Standards Commission) (providing for thirteen members severally appointed by the Chief Justice, State Bar Council, Governor, and General Assembly to serve six-year terms, and for cause and disqualification removal); *id.* § 115D-2.1 (2013) (State Board of Community Colleges) (providing for twenty-one members appointed by the Governor and General Assembly, various limited terms, and removal by vote and recommendation from the Ethics Commission); *id.* § 138A-7 (2013) (State Ethics Commission) (providing for eight members, four each appointed by the General Assembly and Governor to serve staggered terms, and removal for cause).

[22] *See, e.g.*, N.C.G.S. § 162-5.1 (2013) (In forty six counties, the board "shall elect the person recommended by" the prior sheriff's political party to fill a vacancy in the office of sheriff.); *id.* § 163-19 (2013) (State Board of Elections) (providing for five members, requiring the Governor to appoint members from a list of nominees submitted by the two largest political parties, and limiting members to two consecutive four-year terms).

[23] *See, e.g.*, N.C.G.S. § 62-10(f) (2013) (Utilities Commission) (independent commission performing judicial functions but residing in executive branch; members appointed by Governor subject to legislative confirmation); *id.* § 97-77(a1) (2013) (Industrial Commission) (independent commission performing judicial functions but residing in executive branch; members appointed by Governor but must be confirmed by the General Assembly).

officers and organize executive departments. The executive branch executes the laws as enacted by the General Assembly. The constitution expressly acknowledges the General Assembly's power to assign duties and functions to the executive branch under its broad lawmaking power. N.C. Const. art. III, §§ 5(10), 7(1)-(2), 8, 11. The executive branch officials and their departments carry out these statutory duties and functions. *Id.* art. III, §§ 5(10), 7(1)-(2). The General Assembly retains the prerogative to change these duties, the organization of the executive branch, and the branch's supervisory structure. *Id.* art. III, §§ 5(10), 7(1)-(2), 11. Though the General Assembly may have assigned a particular function to a constitutional executive officer at present, the constitution provides that the legislature can assign that function elsewhere. *Id.*

To overturn a law of the people acting through the General Assembly, the Court must find an express constitutional violation beyond a reasonable doubt. As demonstrated by the text and history of our constitution and by our jurisprudence, the General Assembly in exercising its express constitutional lawmaking power has the authority to appoint a majority of the members of executive commissions that it has created by statute. The authority to appoint is simply a mode of filling positions and does not result in control over the appointed officials. Absent an explicit constitutional amendment such as that proposed in 1968, the General Assembly's constitutional power, including its appointment authority, remains unchanged. While I agree with the majority that the statutes in question do not violate the

*NEWBY, J., concurring part and dissenting in part*

appointments clause, *id.* art. III, § 5(8), I do not believe that the challenged provisions

violate separation of powers.  Accordingly, I concur in part and dissent in part.