THE TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA, v. ALEXANDER McIVER.*

The amendment to the Constitution, Art. IX, Sec. 13, adapted by the General Assembly, February, 1873, was adapted and satified by the people in accordances with the provisions of the Constitution, Art. XIII, Sec. and is a part thereof.

The act of 1873–'4 Chap. 64, providing for the election of Trustees of the University, was passed in accordance with the provisions of the Constitution, and the Trustees elected under that act were properly elected.

CIVIL ACTION brought to the Spring Term, 1874, of the Superior Court of ORANGE county, and heard upon the plaintiffs' demurrer to the answer of the defendant, before his Honor, Judge *Tourgee*, at Chambers, on the 12th day of June, 1874.

The plaintiffs, claiming to be Trustees of the University of

*NOTE.—This case was argued at the last (January) Term, but on account of the illness of the *Chief Justice* who could not be present, and the disagreement of the members of the Court upon one of the points, an *advisari* was taken to this Term.

the State, being elected as prescribed by the Act of 1873-'74, chapter 64, entitled "An act to provide for the election of Trustees of the University of North Carolina," which act was passed in pursuance of sec. 5, Art. ix, of the amended Constitution, bring this action against the defendant, the Superintendent of Public Instruction, to recover the books, records, seal and other property of the University, in the custody of the defendant by order of the Board of Education.

The defendant in his answer, denies that the plaintiffs are the Trustees of the University, alleging that the amendments to the Constitution, as proposed by the Act of 1871-'72, chap. 53, and passed again by the requisite majority, 24th day of February, 1873, (Act of 1872-'73, chap. 86, and submitted to the people for ratification or rejection, by the Act of 1872-'73, chap. 153, were never passed and ratified according to the requirements of sec. 2, Art. xiii, of the Constitution, and are therefore no part thereof. And for a second defence, the defendant insists, that if the amendments were duly passed and ratified, still the election of Trustees by the General Assembly, under the Act of 1873-'74, chap. 64, was not authorized by those amendments, and is consequently void.

The plaintiffs demurred to the defendant's answer, alleging that the Court was bound by the certificate of his Excellency the Governor, attested by the Great Seal of the State and deposited in the office of the Secretary of State, and that his Honor, in this investigation, had no authority to look behind that certificate; and as to the second defence of the defendant, the plaintiffs insist, that the Legislature having "power to provide for the election of Trustees," was the sole judge of the manner in which that power should be exercised.

His Honor being of opinion with the defendant upon both the questions raised by the pleadings, overruled the demurrer, from which judgment the plaintiffs appealed.

*Moore & Gatling, Battle & Son* and *J. W. Graham,* for appellants.

*Batchelor,* contra.

BYNUM, J. The provision of the Constitution, before the amendment now to be construed, was as follows: "The Board of Education shall elect Trustees of the University as follows: One for each County in the State, whose term of office shall be eight years." Art. 9, Sec. 13. The amendment to the Constitution strikes out section 13, and substitutes the following: "The General Assembly shall have power to provide for the election of Trustees of the University," etc. After this amendment was adopted and declared to be a part of the Constitution, the General Assembly passed an act in these words: "*The General Assembly of North Carolina do enact,* In pursuance of the authority granted by the 5th Section of the 9th Article of the amended Constitution, that there shall be sixty-four Trustees of the University of North Carolina elected by joint ballot of both Houses of the General Assembly, on the 29th day of January, 1874, whose term of office shall be eight years," etc. In pursuance of this act, Trustees were elected, who bring this action for the corporate property of the University.

Two questions are made: 1st. Was this amendment duly ratified, so as to become a part of the Constitution? and 2d. Supposing the amendment to have been duly ratified, was the election of Trustees in conformity therewith.

The Constitution provides two modes for its amendment—one by a Convention to be called by the General Assembly, and the other provision is as follows: "No part of the Constitution of this State shall be altered unless a bill to alter the same shall have been read three times in each House of the General Assembly and agreed to by three-fifths of the whole number of members of each House respectively; nor shall any alteration take place, until the bill so agreed to, shall have been published six months previous to a new election of members to the General Assembly. If after such publication, the alteration proposed by the preceding General Assembly shall be agreed to, in the first session thereafter, by two thirds of the whole representation in each House of the General Assembly,

TRUSTEES UNIVERSITY OF NORTH CAROLINA *v.* McIVER.

after the same shall have been read three times, on three several days in each House, then the said General Assembly shall prescribe a mode by which the amendment or amendments may be submitted to the qualified voters for members of the House of Representatives, throughout the State; and if upon comparing the votes given in the whole State, it shall appear that the majority of the voters voting thereon, have approved thereof, then, and not otherwise, the same shall become a part of the Constitution." Art. 13, Sec 9.

Under this provision, a bill was duly passed by our General Assembly, which contained seventeen amendments, including therein the one in relation to the University. After a new election, the next General Assembly rejected nine and adopted eight of these amendments, which had all been previously incorporated and adopted in one bill, but incorporated each of the nine amendments in a separate bill, and in that form submitted them to the vote of the people, who approved of each amendment by a majority of nearly forty thousand votes.

It is insisted that these amendments were not constitutionally adopted, and are therefore invalid. The argument is, that the Constitution contemplated and required that the same bill and the same amendments, without change, should have the approval of each General Assembly, and that it by no means followed because the second General Assembly adopted separately eight ont of seventeen amendments adopted by the first General Assembly, that it would have adopted the seventeen or any of them, if they had been voted upon by the second body, in the form adopted by the first body. And it is urged that the second General Assembly, in fact, did reject them in that form, and only adopted eight of them, and that only after shaping them into eight separate bills. And that conversely, it does not follow because the second General Assembly adopted eight of the amendments in eight separat[e] bills, the first General Assembly would have so adopted th[em] or any of them, for that some one or more of the amendm[ents] rejected by the second General Assembly might have bee[n]

inducing cause of the adoption of the seventeen as a whole, by the first General Assembly. And that thus, there was not the concurrence of two Legislatures upon the same amendments, according to the words and spirit of the Constitution.

Constitutions lay down general propositions, and do not deal in details, leaving these to be worked out by the Legislature. If it can be shown that these amendments or any of them, have not been made in accordance with the rules prescribed by the fundamental law, every principle of public law and sound policy requires the Court to pronounce against them. But this cannot be shown. They have been adopted in accordance with the language of the Constitution, because each amendment has passed through all the forms of legislative enactment prescribed by that instrument. They do not violate the spirit of the Constitution in the manner of their adoption, for although they finally assumed the shape of eight separate bills, they are yet the eight identical amendments adopted by the first Legislature, and it cannot be shown why the amendments adopted in eight bills would not have been as valid in one bill, as originally passed, or why they should have been less valid because they were adopted in eight bills instead of one. The substance and even the precise form of the amendments adopted were the same and unaltered from their inception to their consummation in the Constitution. The proposed mendments were of distinct and independent parts of the Constitution, and were as much so when incorporated in one bill, as when incorporated in eight bills. There is nothing in our law which requires, as in some States, that each subject matter of legislation shall be put in a separate bill. These amendments are therefore just as valid in one bill as in the eight bills, and it appears change was a matter of supererogation, more calculated to raise doubts than to solve them. But the mendments do not derive their force from the Legislatures ch devised them, but from the people who ratified them, n this case they have spoken with no uncertain sound. a Convention framed these amendments, it unques-

tionably would have had the power to submit them to the people as one act or several.   The power of the General Assemb'y cannot be distinguished from the powers of a Convention upon the question of submitting its amendments to popular vote.  When the voice of the people is constitutionally expressed in their favor, the amendments become and are a part of the fundamental law.

At the last term, all the members of the Court then present, concurred in the opinion that the amendments to the Constitvtion were duly ratified, and it was so publicly announced from the Bench, on the argument.   The opinion was not then filed, because the CHIEF JUSTICE was absent by reason of sick·ness, and it is always desirable to have a full Court on constitutional questions, and because it was doubted by some of the Court whether the action of the Legislature, in electing trustees of the University, was in conformity to the Constitution as amended.

The provision of the Constitution, as amended, is that " The General Assembly shall have power to provide for the election of Trustees of the University," &c.   Accordingly, that body did enact as follows : *" The General Assembly of North Carolina do enact:* In pursuance of the authority granted by the fifth section of the ninth article of the Constitution, that there shall be sixty-four Trustees of the University of North Carolina elected by joint ballot of both Houses of the General Assembly," &c.   Looking at this act of the Legislature by itself, without reference to the Constitution, there can be but one construction put upon it, and that is that it does " provide for the election of Trustees of the University," and is a literal compliance with that provision of the Constitution as amended.   It is, however, objected that it was not the meaning of the Constitution, that the body to " provide for the election " should have the power to make the election.   Why not ?   The Constitution does not forbid it, nor does it designate any electoral body by which the election is to be made.   In conferring upon the General Assembly the power to provide for the election of

6

Trustees, the whole power of the Constitution upon the subject was exhausted, and the Legislature became clothed with the supreme power, unless it may be limited by other parts of the Constitution. It is no argument to urge that it was indelicate for the same body which provided for the election of trustees, afterwards to proceed itself to make the election ; for it is a question of power and not one of eqtiquett in its exercise. But even here we have innumerable examples in the political history of this country, where both constitutional and legislative bodies have first created offices and then proceeded to fill them, even out of the members of the very bodies which created the offices. This is not unusual in American history.

Suppose a merchant in Raleigh should direct his agent in New York " to provide for " the shipment of a cargo of cotton to Liverpool. Would it be less a compliance with the order, because the agent himself furnished the shipping instead of hiring it from others ? When the Constitution or an individual authorizes a thing to be done and no more, the manner of doing it is left to the agent. There is not only nothing in this article of the Constitution forbidding the Legislature to elect trustees, but there is no reason which makes such election inconsistent with the spirit of the instrument. What was the evil this amendment to the Constitution was intended to remedy ? Prior to the amendment, the Constitution provided that the trustees should be elected by the Board of Education, and the Legislature had but a limited control of the University, and under that system, or from other causes, the University had languished and had finally suspended operations. But under the old Constitution in force prior to the war, the trustees were elected by the Legislature and the Institution was under its control, and in that capacity had flourished and was regarded by its friends as the pride and ornament of the State. Now the purpose of the amendment under discussion avowedly was, and the public debates resulting in this amendment, show beyond cavil, that its purpose was to restore the University to the same form of government which existed un-

der the old Constitution, and which, it was believed by its advocates, would restore that school of learning to its former prosperity and reputation. Accordingly we find that the very legislative body which adopted this amendment and was conversant with its meaning, immediately upon its ratification, passed the act we are now construing, and provided therein for the election of trustees as they were elected before the war. Thus the very legislative body which drafted the constitutional amendment, gave a legislative construction of the meaning of its terms. This interpretation, therefore, is entitled to peculiar respect. *Lewis' case,* 29 Penn., 578 ; Brightly on Elections, 667, 677, 678, and cases in note ; *ex parte Dodd,* 6 Eng., 152 ; *Ogden* v. *Sanders,* 12 Wheat, .291.; .Cooly 69 ; Story on Const., 407.

But the objection is made that Sec. 10, Art. 3, of the Constitution, prohibits the Legislature from making this election. That section is in these words : " The Governor shall nominate, and by and with the advice and consent of a majority of the Senators elect, appoint all officers whose offices are so established by this Constitution, or which shall be created by law, and whose appointments are not otherwise provided for, and no such officer shall be appointed or elected by the General Assembly." Now, it is clear that this section of the Constitution was not meant to prohibit the General Assembly from electing any officer at all, for Sections 11, 20 and.22, of Article .2, and Section 3, Article 6, provide in express terms for the election of certain officers by the General Assembly. The true construction of this section of the Constitution is, that it prohibits the election by the General Assembly only of " those officers whose appointments are not otherwise provided for ;" but where their appointment is otherwise provided for in the Constitution, that mode, whatever it may be, or by whatever electoral body, is as valid as any other expressly prescribed in that instrument. So after all, the single enquiry is, what is the proper construction of this amendment of the Constitution in relation to the University, uncontrolled by Section .10 or

any other provision of the Constitution. For it will not do to say that Section 10 controls the amendment, and not the amendment controls Section 10. The principles of construction make Section 10 subservient to the amendment, if there is an irreconcilable conflict between them. Even where the entire instrument was formed at the same instant of time, the rule is, " that if two provisions of the written Constitution are irreconcilably repugnant, that which is last in point of time and local position is to be preferred." Cooly 58, *note*.

If, therefore, there was a real and irreconcilable conflict between the amendment and Sec. 10, or any other part of the Constitution, as for example, if the amendment had provided, expressly, that " the Legislature shall elect Trustees of the University," by every rule of construction, that provision would control all others, as to that particular class of officers, but it would at the same time leave the prohibitory clause of Sec. 10 in full force in all other cases. If this is not the rule, it would follow that an amendment engrafted upon the Constitution, although expressly intended to make a change, would fail, if it conflicted with any part of the very instrument it was intended to alter. But there is no conflict between Sec. 10 and the amendment, as effect may be given to both provisions; for the amendment merely qualifies the other provisions of the Constitution by giving the election of these Trustees only, to the Legislature, leaving the prohibition in Sec. 10 to operate in all the cases therein provided for. To illustrate: Almost every act of incorporation either repeals or suspends some part of the general law of the land, yet the law is not the less operative in all other cases. So also, the amendment is not unlike an exception in a grant.

Bvt it is objected that the amendment only conferred upon the Legislature the power to delegate, and not to exercise, the elective franchise, and therefore, that the election by that body was void. In reply to this it may be affirmed, if not as an axiom, yet as a safe proposition, that where a body has the power of delegating an authority, without limitations or re-

strictions, there it has itself the power of doing the thing delegated.   It may perform any act it can authorize another to do, upon the principle that the less is included in the greater. *Rice* v. *Packman*, 16 Mass. 326 ; Cooly 100.

But it is again objected, that in electing the Trustees the Legislature usurped an executive power, which is forbidden by the theory, if not the words of the Constitution.   Now the election of officers is not an executive, legislative or judicial power, but only a mode of filling the offices created by law, whether they belong to one department or the other.   The election of a judge is not a judicial power, nor the election of a Governor an executive power; for if so, all elections by the people would be an infringement upon the executive department.   The true test is, where does the Constitution lodge the power of electing the various public agents of the Government, and it is conclusive upon the judicial mind, whether this power is found to be lodged in the one or the other branch, or concurrently in all these departments into which the supreme authority of the State is divided.

The purpose of the Constitution was that there should be Trustees of the University, and that they should be elected by the Board of Education.   The purpose of the amendment is, that they shall no longer be elected by the Board of Education, but in such way as the Legislature may provide, and to that end, unlimited power is vested in that body, as to the number of Trustees, and the mode of election, leaving both to the wisdom and discretion of the Legislature.   This view is the more apparent, when we compare the amendment with other parts of the Constitution.   For example, Sec. 1, Art. 3, provides that the Governor, &c., shall be elected for a term of four years, " by the qualified electors of the State."   Sec. 21, Art. 4, provides that a clerk of the Superior Court of each county, " shall be elected by the qualified voters thereof."   Sec. 26, Art. 4, provides that the Justices of the Supreme and Superior Courts " shall be elected by the qualified voters of the State," and so in regard to all the other officers of the

State. Wherever a particular mode of election was intended, it was plainly and in direct terms, as in these examples, provided in the Constitution. If, therefore, this amendment had intended any one mode of election, it would have so declared in the like express terms. As it did not so declare, who is to decide, but the Legislative body upon which the whole power is conferred?

The Constitution provides but two modes of election for all public officers, one by the people and the other by the Legislature. It certainly was not intended that the people should elect the Trustees of the University. A proposition to elect sixty-four Trustees by the people at large would be absurd. It would be more reasonable thus to elect directors of railroads, and the penal and charitable institutions of the State. The only other mode of election is by the Legislature, or as it may, as in this case, prescribes. The amendment opened two courses to that body, either to devolve the election on some other body, selected for the purpose, or to exercise the power itself. It wisely chose the latter course. A constitutional body of gentlemen, from every county in the State, chosen by the people for their supposed fitness, assembled together for deliberation and the enactment of laws for the public welfare, is the most eminently fit to choose as Trustees, those who are worthy and disposed to discharge the gratuitous duties of the office.

The Constitution of the United States has a provision very similar to the amendment we are now considering. Art. 2, Sec. 2, provides that "each State shall appoint, in such manner as the Legislature thereof may direct, electors," &c. The construction of this clause of the Federal Constitution, has been, that it confers upon the Legislature the power to elect or to refer the election to the people. Commenting upon this provision of the Federal Constitution, Curtis uses this language: "In this place it was proposed that each State should appoint, in such manner as the Legislature* might direct, a number of electors equal to the whole number of Senators and Representatives in Congress to which the State might be entitled

under the provisions of the Constitution already agreed upon. The advantages of this plan were, that it referred the mode of appointing the electors to the States themselves, so that they could adopt a popular election, or a election by the Legislature, as they might prefer." Hist. of the Const., Vol. 2, 389. To the same effect is Story : "It is observable that the language of the Constitution, is that "each State shall appoint in such manner as the Legislature thereof may direct," the number of electors to which the State is entitled. Under this authority the appointment of electors has been variously provided by the State Legislatures. In some States the Legislatures have directly chosen their electors by themselves ; in others they have been chosen by the people by a general ticket, through the whole State ; and in others by the people in electoral districts fixed by the Legislature, a certain number of electors being appointed to each district. No question has ever arisen as to the constitutionality of either mode, except that of a direct choice to the Legislature.

" But this, though often doubted by able and ingenious minds, has been firmly established in practice, ever since the adoption of the Constitution, and does not now seem to admit of controversy, even if a suitable tribunal existed to adjudicate upon it. At present, in nearly all the States, the electors are chosen either by the people by a general ticket, or by the State Legislature." Com. on Const., vol. 3, sec. 1466. So that although there has been some diversity of opinion, the construction of this provision of the Constitution has been finally settled in favor of the legislative power.

We conclude, therefore, both from reason and authoirty, that the Legislature in electing Trustees of the University, only exercised a power conferred upon them by the Constitution.

PEARSON, C. J. I was not in attendance, owing to sickness, when the Associate Justices at the last term of the Court, had this case under consideration.

They inform me there was no difference of opinion upon the

question as to the ratification by the people at the election in August, 1873, of all of the amendments to the Constitution which were submitted to a vote, and the Associate Justices concurred in the conclusion that the amendments were duly adopted, and form a part of the Constitution. I concur in this opinion.

The Associate Justices further inform me there was a difference of opinion on the question as to the constitutionality of the act which provides "the General Assembly shall elect the Trustees of the University;" an *advisari* was taken for the purpose of enabling me to take part in the decision of that question.

The amendment under consideration strikes out sections 5, 13, 14 and 15 of Article 9, "Education," and enacts, "The General Assembly shall have power to provide for the election of Trustees of the University of North Carolina."

It is said this general power is restricted by a prohibition in section 5, Art. 3, "Executive Department." "And no such officer shall be appointed or elected by the General Assembly." No reference to this prohibition is made in the amendment, and the argument is: The original Constitution and the amendment are to be construed together." The amendment is to be considered as if it had been inserted in the original Constitution. An express prohibition cannot be made to yield to an inference drawn from the general words used in conferring the power. Therefore, the General Assembly has power to provide for the election of Trustees, in any other mode, save that of an election by the members of its own body.

This conclusion follows, provided the premises be admitted: Is the proposition true, an amendment to the Constitution is to be considered, as if it had been in the original instrument?

In support of this proposition, reliance is put upon the analogy of a settled rule of construction in regard to amendments in pleadings, both in courts of law and of equity; but in my opinion this is not in point. A party cannot amend his pleading without obtaining the leave of the Court; in order to prevent the party from having benefit by his omission to in-

sert the matter in the original pleadings, the leave of the Court is given on the condition, that the amendment shall be considered, *as if* it had been inserted in the first instance. The people, voting in accordance to the provisions of the Constitution, have power, without asking the leave of anybody—to make, amend, alter or modify the Constitution at any time, and to any extent a majority may see fit. There is no occasion for any condition or for a resort to legal fiction, but in putting a construction upon the amendment, the Court is to take the fact as it is, the amendment was made *after* the adoption of the Constitution, and is bound to give full effect to the amendment, as the last expression of the will of the people; true, the Constitution and the amendment are to be construed together; but the object is to see how far the original Constitution must yield, in order to give full effect to the amendment. As the power conferred upon the General Assembly is without any restriction, full effect cannot be given to the amendment without making the prohibition contained in the original instrument yield to the extent of allowing an exception in respect to the appointment or election of Trustees of the University.

The rules adopted by the Courts for the construction of codicils, furnish a more apt analogy and are doubly in point. The testator, observing the formula required by law, can revoke, amend, alter or modify his will, at any time and to such extent as he is minded; the Courts look upon the codicil as the last expression of his will, and give full effect to it, by making " the will " yield as far as is necessary for that purpose. The fiction that the codicil must be considered *as if* it had been inserted in the will is not resorted to, and the Courts give full weight to the fact that the codicil was made *after* the will, and the extent to which the intention of the testator had been changed is judged of by the words of the codicil, giving effect to the will and construing it with the codicil only, so far as the will can be allowed to operate without detracting from the effect of the codicil.

So, in reference to the General Assembly, that body has

power to repeal or amend any prior statute. An amendatory statute is construed with reference to the fact that it was enacted *after* the original statute, and the portion of the second statute being considered as if it had been inserted in the first, as never has been suggested.

So, in reference to deeds; the party to a deed may rescind or alter it by the execution of a second deed. There is no necessity for the leave of any one to enable them to do so, and the Courts give full effect to the last deed, as expressing the intention of the parties, the first deed being referred to only for the purpose of seeing how far he must yield in order to give full effect to the last.

Thus, it is seen that in construing codicils, amendments to Constitution, amendments of statutes, and the alteration of deeds, the Courts give weight to the fact that the one is made *after* the other, and the *fiction* that an amendment to pleading is to be considered *as if* it had been inserted in the first instance, stands isolated, and is confined to the case of an amendment to pleading, because of the special ground on which it rests.

The mode of electing Trustees by "the Board of Education" had not been attended with a favorable result; under the old mode of electing Trustees "by the members of the General Assembly," the institution had flourished until blighted by the desolation of war; so, when the former was discarded by the amendment and struck out of the Constitution, it was naturally to be expected that the old mode would be again adopted. These are parts of history, to be taken into consideration as bearing upon the construction of the amendment, and seems to me to be conclusive.

Had the amendment provided: "The Trustees shall be elected by the members of the General Assembly," so as to adopt the old mode, in so many words, it would have had the advantage of being direct and free from all room for construction, but it would have been exposed to one objection urged against the mode adopted in the Constitution, which the amend-

ment strikes out, to-wit: there could be no change in the mode without delay and expense incident to all changes of the fundamental law; whereas, by conferring an unrestricted power upon the General Assembly, that body could adopt the old mode, or some other, and if the mode adopted in the first instance proved unsuccessful, set aside and substitute another by ordinary legislation; for instance, if the General Assembly adopted the old mode, and that, under the new conditions resulting from the war, did not prove a success—then another mode—an election by the Alumni of the University, could be tried, or any other which circumstances might, in the wisdom of the General Assembly, be deemed expedient.

The objections, that under the power to provide for the election of Trustees, conferred upon the General Assembly, that body could not provide for an election by its own members, besides being met by reference to the past history of the University, is opposed by the analogy of the law. It is settled— a will of property to A to do with, as he pleases, confers absolute ownership. If an unrestricted power of appointment be given it confers the ownership, for, if the party to whom the power is given, does not exercise it, the presumption is that he makes an appointment to himself. This inference of the law is based on a knowledge of human nature, and the effect of self-interest, which is presumed to prevail among corporate bodies, whether political or merely civil, as well as among individuals; and with deference to the opinion of others, my conviction is, according to the principles of human nature and the analogies of the law, based upon them, in granting this unmistakable power to the General Assembly, it was not only expected, but it was the intention of the amendment, that the General Assembly should adopt the old mode of election, and should that not answer, then that body has power to substitute another.

PER CURIAM. Judgment reversed, and judgment for the plaintiffs upon the demurrer.