Justice NEWBY
concurring in part and dissenting in part.
This case presents the issue of whether the General Assembly has the constitutional power to fill a majority of positions on executive commissions it creates. Unlike the Federal Constitution, the state constitution is not an express grant of power but a limitation on power. All power not expressly granted to the federal government or limited by the constitution resides in the people and is exercised through the General Assembly. Since our original Constitution of 1776, except for a short time by explicit limitation, the General Assembly has had the constitutional authority to provide for the filling of statutory executive positions it creates. As an exercise of the General Assembly’s lawmaking power, this appointment authority, both constitutionally prescribed and jurisprudentially recognized, does not implicate separation of powers because under our jurisprudence the authority to appoint the official has never been deemed the power to control the appointee. Our state’s constitutional text and history and this Court’s precedent demonstrate that when the legislature statutorily enables itself to select the official, it is simply filling the position and not controlling the appointee.[1] Because *650 the statutes at issue here are constitutional, I must respectfully dissent in part.
The idea of one branch of government, the judiciary, preventing another branch of government, the legislature, through which the people act, from exercising its power is the most serious of judicial considerations. See Hoke v. Henderson, 15 N.C. (4 Dev.) 1, 8 (1833) (“[T]he exercise of [judicial review] is the gravest duty of a judge, and is always, as it ought to be, the result of the most careful, cautious, and anxious deliberation.”), overruled in part on other grounds by Mial v. Ellington, 134 N.C. 131, 162, 46 S.E. 961, 971 (1903); Trs. of Univ. of N.C. v. Foy, 5 N.C. (1 Mur.) 58, 89 (1805)[2] (Hall, J., dissenting) (“A question of more importance than that arising in this case [the constitutionality of a legislative act] cannot come before a court.... [W]ell convinced, indeed, ought one person to be of another’s error of judgment ... when he reflects that each has given the same pledges to support the Constitution.”). Since its inception, the judicial branch has exercised its implied constitutional power of judicial review with “great reluctance,” Bayard v. Singleton, 1 N.C. (Mart.) 5, 6 (1787), recognizing that when it strikes down an act of the General Assembly, the Court is preventing an act of the people themselves, see Baker v. Martin, 330 N.C. 331, 336-37, 410 S.E.2d 887, 890 (1991).
All political power resides in the people, N.C. Const, art. I, § 2, and the people act through the General Assembly, State ex rel. Ewart v. Jones, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895) (“[T]he sovereign power resides with the people and is exercised by their representatives in the General Assembly.”). Unlike the Federal Constitution, “a State Constitution is in no matter a grant of power. All power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it.” McIntyre v. Clarkson, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961) (quoting Lassiter v. Northampton Cty. Bd. of Elections, 248 N.C. 102, *651 112, 102 S.E.2d 853, 861 (1958), aff’d, 360 U.S. 45, 79 S. Ct. 985, 3 L. Ed. 2d 1072 (1959)); see also Jones, 116 N.C. at 570-71, 21 S.E. at 787 (“The only limitation upon this power is found in the organic law, as declared by the delegates of the people in convention assembled from time to time.”). The presumptive constitutional power of the General Assembly to act is consistent with the principle that a restriction on the General Assembly is in fact a restriction on the people. Baker, 330 N.C. at 336, 410 S.E.2d at 890 (“[G]reat deference will be paid to acts of the legislature — the agent of the people for enacting laws.” (quoting State ex rel. Martin v. Preston, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989))). Thus, this Court presumes that legislation is constitutional, and a constitutional limitation upon the General Assembly must be express and demonstrated beyond a reasonable doubt. E.g., Hart v. State, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).
This rigorous standard for constitutional challenges ensures uniformity and predictability in the application of our constitution. State v. Emery, 224 N.C. 581, 584, 31 S.E.2d 858, 861 (1944) (“[Constitutions] should receive a consistent and uniform construction . . . even though circumstances may have so changed as to render a different construction desirable.” (citing, inter alia, State ex rel. Att’y-Gen. v. Knight, 169 N.C. 333, 85 S.E. 418 (1915))); see also Bacon v. Lee, 353 N.C. 696, 712, 549 S.E.2d 840, 851-52 (“A primaiy goal of adjudicatory proceedings is the uniform application of law. In furtherance of this objective, courts generally consider themselves bound by prior precedent, i.e., the doctrine of stare decisis.” (citations omitted)), cert. denied, 533 U.S. 975, 122 S. Ct. 22, 150 L. Ed. 2d 804 (2001). Adhering to this fixed standard ensures that we remain true to the rule of law, the consistent interpretation and application of the law. State v. Bell, 184 N.C. 701, 720, 115 S.E. 190, 199 (1922) (Stacy, J., dissenting) (“[Tjhere must be some uniformity injudicial decisions ... or else the law itself, the very chart by which we are sailing, will become as unstable and uncertain as the shifting sands of the sea_”).
Under a proper application of these foundational principles, the constitutional challenge here cannot surmount the high bar imposed by the presumption of constitutionality given to legislative acts. A clear understanding of the constitutionally prescribed powers and their division among the branches of government is a basis for stability and cooperation within government. Because that stability instills public confidence in governmental actions, this Court should follow its time-honored approach in assessing the powers conferred upon each branch of government and applying separation of powers principles.
*652 Since 1776 our constitutions have expressly vested the vast legislative power, the power to make laws, in two distinct chambers of the General Assembly, the Senate and the House of Representatives. N.C. Const. art. II, § 1; N.C. Const. of 1868, art. II, § 1; N.C. Const. of 1776, § I; see also Legislative Power, Black’s Law Dictionary (10th ed. 2014) (“The power to make laws and to alter them; a legislative body’s exclusive authority to make, amend, and repeal laws.”). This express power to make laws is broad and has not changed; it is limited only as expressly forbidden by the constitution and by federal law. McIntyre, 254 N.C. at 515, 119 S.E.2d at 891-92; Jones, 116 N.C. at 570-71, 21 S.E. at 787; see, e.g., Bayard, 1 N.C. (Mart.) at 7 (declaring an act of the General Assembly unconstitutional because it violated the constitutional right to a trial by jury); see also Dickson v. Rucho, 365 N.C. 481, 504, 781 S.E.2d 404, 422 (2015) (recognizing restriction of state legislative power by federal law).
In addition to federal limitations on state legislative power, the state constitution provides express restrictions safeguarding against an abuse of legislative power. See, e.g., N.C. Const. art. II, § 23 (prescribing the procedure for the passing of revenue bills); id. art. II, § 24 (limiting certain local, private, or special acts); id. art. Ill, § 5(11) (limiting “reconvened sessions” to considering certain bills); id. art. IV, § 1 (limiting authority to establish certain courts or to deprive courts of jurisdiction “that rightfully pertains to [the courts] as a co-ordinate department of the government”); id. art. V, §§ 1, 2(l)-(7) (limiting taxing authority); id. art. V, § 3(l)-(2), 4 (limiting authority regarding debt); id. art. VI, § 9 (preventing the appointment of an official already serving in one branch to serve simultaneously in another branch).[3]
Moreover, the General Assembly is checked and balanced by its structure and its accountability to the people. See N.C. Const, art. I, *653 § 2. Legislative power is divided between two chambers,[4] with its combined one hundred seventy members. Id. art. II, §§ 2,4 (providing for 50 senators and 120 representatives). The members of each chamber serve different constituencies with various needs and priorities. Id. art. II, §§ 3, 5. The General Assembly’s power is diffused by its sheer magnitude, its diversity within each chamber, and, consequently, the need to find compromise. See 1 James Bryce, The American Commonwealth 480 (3d ed. 1901) (“The Americans restrain their legislatures by dividing them . . . .”). History has shown that the legislative branch is not a continuously cohesive force; disagreements between the two chambers are not infrequent.[5] The diversity within the branch, however, ensures healthy review and significant debate of each proposed statute, the enactment of which frequently reaches final form through compromise. Likewise, members of the legislative branch face the most frequent elections, serving only two-year terms,[6] N.C. Const, art. II, §§ 2,4, and are thereby most directly accountable to the people. Lawmakers represent the particular interests of their different constituents, who are limited in number. Id. art. II, §§ 3, 5. In addition to these structural safeguards, the final check on the legislative power of the General Assembly is judicial review, the implied constitutional authority of the court to decide if a law violates the constitution. See Bayard, 1 N.C. (Mart.) at 6-7; see generally Hoke, 15 N.C. (4 Dev.) at 28 (observing that the constitution “guards against abuse” of legislative power through “frequent elections,” protection of individual rights, division of powers, and judicial review).
*654 This broad constitutional power to make .laws includes the indisputable authority of the General Assembly to create executive statutory offices. Along with the power to create the office, the legislature has the power to assign the selection authority either to itself or another. See, e.g., State ex rel. Martin v. Melott, 320 N.C. 518, 520, 524, 528, 359 S.E.2d 783, 785, 787, 789 (1987) (plurality) (stating, with one dissenting judge agreeing, that the General Assembly had the constitutional power to appoint the position itself); State ex rel. Cherry v. Burns, 124 N.C. 761, 765, 33 S.E. 136, 137 (1899) (concluding that the constitution “leads us to the opinion that the Legislature may fill this [statutory] office” (citations omitted)); Cunningham v. Sprinkle, 124 N.C. 638, 641, 33 S.E. 138, 139 (1899) (“[B]eing of legislative creation,” appointments of members of the Board of Agriculture “are equally within the power of legislative appointment.”); State Prison v. Day, 124 N.C. 362, 367, 32 S.E. 748, 749 (1899) (concluding that the constitution intended “to con-ferupon the General Assemblythepowerto fill offices createdby statute”), abrogated on other grounds by State ex rel. Salisbury v. Croom, 167 N.C. 223, 228, 83 S.E. 354, 356 (1914); Jones, 116 N.C. at 574, 21 S.E. at 788 (“Here, the Legislature had the constitutional power to create the office and fill it....”).
The only express constitutional limitation on statutory appointments forbids any member of one branch from serving simultaneously in another branch of government; however, that prohibition does not speak to who has the authority to appoint. N.C. Const. art. VI, § 9; N.C. Const. of 1868, art. XIV, § 7 (1873); N.C. Const. of 1776, art. IV, § 4 (1835); N.C. Const. of 1776, §§ XXVI-XXX; see also State ex rel. Wallace v. Bone, 304 N.C. 591, 608-09, 286 S.E.2d 79, 88-89 (1982) (concluding that, if an appointing authority appoints an official from one branch to an official role in another branch, that official unconstitutionally exercises the power of two branches). There is no constitutional limitation on the General Assembly’s designating itself as the appointing authority of positions it creates by statute.
The people have retained for themselves alone the only constitutional method of changing the powers of each of the branches: the constitutional amendment. As discussed below, for only an eight-year period, the people limited the General Assembly’s power to designate the appointing authority for statutory offices. Thereafter, the people expressly removed any such limitation. Most recently, the people modified the legislative power by passing a constitutional amendment granting the Governor the power to veto certain legislation. See Act of March 8,1995, ch. 5, §§ 3, 4,1995 N.C. Sess. Laws 6, 8 (establishing referendum *655 to amend the constitution to provide gubernatorial veto to take effect 1 January 1997). A gubernatorial veto requires a three-fifths vote in each chamber to override. N.C. Const, art II, § 22. Thus, legislative power remains broad, limited only by express constitutional provision.
Unlike the unified executive present in the federal model, the state constitution has never had a unified executive; rather, executive power is dispersed among several specified constitutional executive officers, with the Governor being chief among them. N.C. Const, art. Ill, §§ 1, 7; N.C. Const. of 1868, art. HI, § 1; N.C. Const, of 1776, §§ XIV, XIX. The 1776 constitution, like every constitution thereafter, placed the general executive power in the Governor. N.C. Const, art. Ill, § 1; N.C. Const. of 1868, art. Ill, § 1, 4; N.C. Const, of 1776, § XIX. This constitution vested the Governor with the power to “exercise all the other executive powers of government, limited and restrained as by this Constitution [as] mentioned, and according to the laws of the State.” N.C. Const. of 1776, § XIX; see also Executive Power, Black’s Law Dictionary (10th ed. 2014) (“The power to see that the laws are duly executed and enforced. . . . [Gjovemors’ executive powers are provided for in state constitutions.”). This original constitution, like each constitution thereafter, also provided specific gubernatorial duties. E.g., N.C. Const. art. Ill, § 5 (outlining the “Duties of Governor”); N.C. Const, of 1868, art. Ill, § 6 (“to grant reprieves commutations and pardons”); id., art. Ill, § 9 (“to convene the General Assembly in extra session”); N.C. Const, of 1776, § XIX (including the “power to draw for and apply such sums of money as shall be voted by the general assembly” and to exercise clemency, “the power of granting pardons and reprieves”).
The 1776 constitution, like those that followed, divided the executive responsibilities between the Governor and others, including a Council of State, even though the Governor was expressly given the general executive authority and responsibility. N.C. Const, of 1776, § XIX. This model of diffused executive power, with the Governor exercising the general executive power, was unchanged in the 1868 state constitution. Compare id. § XIX (“[Governor] may exercise all. . . executive powers of government....”), with N.C. Const, of 1868, art. Ill, § 1 (“[Governor] shall be vested [with] the Supreme executive power... .”). Stylistically improved, the 1868 constitution implemented separate articles for each branch, including the first constitutional establishment of the judicial branch. See N.C. Const, of 1868, arts. II-IV. The use of separate articles provided for more detailed descriptions of the workings of each branch. John V. Orth & Paul Martin Newby, The North Carolina State *656 Constitution 19-20 (2d ed. 2013) [hereinafter State Constitution].[7] As in the past, to enable the Governor to fulfill his supervisory role, the 1868 constitution authorized the Governor to gather information from the other executive branch officers and report to the General Assembly. N.C. Const, of 1868, art. Ill, § 7. In summarizing this supervisory role, this provision states: “[The Governor] shall take care that the laws be faithfully executed.” Id. This phrase did not expand the Governor’s powers but stated more explicitly this general supervisory aspect of the Governor’s executive responsibilities in a multimember executive branch.
In other words, the constitution charged the Governor with supervising the executive branch and its functions while, at the same time, granting certain executive powers to other executive officers. E.g., id., art. III, § 1 (listing Governor as one of eight elected offices in the executive branch); id., art. III, § 7 (“The officers of the Executive Department . . . shall. . . severally report to the Governor, who shall transmit such reports, with his message, to the General Assembly ....”); id., art. III, § 9 (authorizing the, Governor to “convene the General Assembly in extra session” “by and with the advice of the Council of State”); id., art. III, § 13 (“The respective duties of the [constitutional executive officers] shall be prescribed by law.”); id., art. III, § 14 (“The Secretary of State, Auditor, Treasurer, Superintendent of Public Works, and Superintendent of Public Instruction, shall constitute ex officio, the Council of State, who shall advise the Governor in the execution of his office .. . .”). The constitution allowed the General Assembly to assign executive duties and functions by statute. Id., art. III, § 13. Thus, while the Governor had general supervisory responsibility, id., art. III, §§ 1, 7, each constitutional executive officer was primarily responsible for executing the laws assigned to that official by the General Assembly, id., art. III, § 13.
The executive branch is fundamentally unchanged under the current constitution. The Governor continues to share the exercise of executive *657 powers with the other constitutional executive officers who are separately elected members of the Council of State, N.C. Const. art. III, §§ 7(l)-(2), 8, while maintaining his supervisory role, id. art. Ill, §§ 1,5(4), notwithstanding possible conflict among these officials, see N.C.G.S. § 147-17 (2013) (allowing the Governor to employ independent counsel). The constitution continues to require the General Assembly to assign by statute executive duties and functions to the constitutional executive officers and the administrative departments. N.C. Const. art. III, § 5(10) (“The General Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time . . . .”); id. art. III, § 7(2) (“[Respective duties [of the Council of State] shall be prescribed by law.”); id. art. III, § 11 (“[A]ll administrative departments, agencies, and offices of the State and their respective functions, powers, and duties shall be allocated by law....”).
In addition to prescribing duties to the executive officers, our current constitution expressly recognizes the General Assembly’s power to organize and reorganize the executive branch. Id. art. Ill, § 5(10) (“The General Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time . . . .”); see id. art. Ill, § 11 (“Regulatory, quasi-judicial, and temporary agencies may, but need not, be allocated within a principal department.”). Thus, the executive power remains diffused and unchanged. Compare N.C. Const. of 1868, art. III, with N.C. Const. art. III. When the people have desired to expand executive authority, they have done so through express constitutional change. Such change occurred in the 1868 constitution, though it proved to be short-lived.
The Constitution of 1868, through a controversial provision, expressly limited the General Assembly’s constitutional authority to assign the selection of statutory officers, expressly granting the appointment authority to the Governor, subject to consent of the Senate:
The Governor shall nominate, and by and with the advice and consent of a majority of the Senators elect, appoint, all officers whose offices are established by this Constitution, or which shall be created by law, and whose appointments are not otherwise provided for, and no such officer shall be appointed or elected by the General Assembly.
N.C. Const, of 1868, art. Ill, § 10. Notably, a specific constitutional provision was required to limit the General Assembly’s lawmaking power and to prevent it from designating an appointing authority other than the Governor.
*658 Eight years later, the people specifically repealed this limitation on the General Assembly’s legislative power by constitutional amendment in 1876. The amendment “restorefd] in considerable measure the former power of the General Assembly.” Thad Eure, Sec’y of State, North Carolina Government 1585-1974 at 798 (John L. Cheney, Jr. ed., 1975). Thereafter, the explicit constitutional power to designate the appointing authority, including the authority to designate itself, again resided in the General Assembly. See N.C. Const. of 1868, art. III. § 10 (1876); Day, 124 N.C. at 367, 32 S.E. at 749 (“[I]t is clear that the [Constitutional] Convention of 1875 intended to alter the Constitution ... to confer upon the General Assembly the power to fill offices created by statute.” (citation omitted)); Jones, 116 N.C. at 572-73, 21 S.E. at 788 (“[T]he [Constitutional] Convention refused to incorporate the words ‘and no such officer shall be appointed or elected by the General Assembly.’ ” (citing Convention Journal of 1875, at 175-76)); see, e.g., Burns, 124 N.C. at 765, 33 S.E. at 137 (“[T]he Legislature mayfill [the] office [of keeper of the capitol].”); Cunningham, 124 N.C. at 641, 33 S.E. at 139 (“[M]embers of the Board of Agriculture... being of legislative creation, ... are equally within the power of legislative appointment.”).[8]
Since this fundamental return to the historical status quo, the constitutional authority' to provide the method of filling statutory offices resides squarely with the General Assembly; the relevant provisions of our constitution regarding legislative power have remained unchanged. N.C. Const. art. II, § 1; see id. art. III, §§ 5(8), (10), 11. In 1968 the North Carolina State Constitution Study Commission acknowledged this broad legislative power. The Study Commission was tasked with drafting and proposing amendments to our current constitution. See N.C. State Constitution Study Comm’n, Report of the North Carolina State Constitution Study Commission i-ii (1968) [hereinafter Report]. The *659 Study Commission reviewed our constitution and transmitted a special report to the Governor and General Assembly, which would serve “as the primary source of guidance for the 1969 legislative session” and adoption of our current constitution. N.C. State Bar v. DuMont, 304 N.C. 627, 635, 286 S.E.2d 89, 94 (1982). As we noted,
a comparison... reveals that our Legislature relied almost exclusively on the Report. Hence, a close study of the Report allows us “to place [ourselves] as nearly as possible in the position of the men who framed the instrument” and allows us to “look to the history [and] general spirit of the times”....
Id. at 635, 286 S.E.2d at 94 (brackets in original) (quoting Perry v. Stancil, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953) (“The court should place itself as nearly as possible in the position of the men who framed the instrument.”)).
In its report the Study Commission explained:
The General Assembly will not be deprived of any of its present authority over the structure and organization of state government. It retains the power to make changes on its own initiative, it can disapprove any change initiated by the Governor, and it can alter any reorganization plan which it has allowed to take effect and then finds to be working unsatisfactorily.
Report at 131-32; see also N.C. Const. art. III, §§ 5(10), 11. Moreover, the Study Commission recommended limiting legislative appointment authority by constitutional amendment. Its proposed amendment would have vested sole authority in the Governor to “appoint and [ ] remove the heads of all administrative departments and agencies.” Report at 113. This proposed constitutional amendment, modestly limiting some legislative appointment authority, was not adopted, thus perserving for the General Assembly its historically broad appointment authority. See N.C. Const. art. III, § 7.
Thus, aside from a short-lived express limitation, the constitutional authority to designate the appointing authority for statutory positions has resided and continues to reside squarely in the General Assembly under its general legislative power to make laws. Therefore, not only does the General Assembly have the undisputed constitutional power to create positions in the other branches, it may also designate to itself the authority to fill the positions.
*660 Since 1776 our state constitutions have contained a separation of powers provision stating “[t]hat the legislative, executive, and supreme judicial powers of government, ought[9] to be forever separate and distinct from each other.” N.C. Const, of 1776, Declaration of Rights, § IV; see N.C. Const, art. I, § 6; N.C. Const, of 1868, art. I, § 8. Notably, the plain language of the provision states that “powers” are to be “separate and distinct.” A violation of separation of powers occurs when one branch of government exercises the power reserved for another branch of government.[10]
The first case in which this Court[11] addressed separation of powers, decided less than fifty years after the adoption of the original constitution, arose in a land title dispute. In Robinson v. Barfield the General *661 Assembly passed a private act attempting to cure a flaw in a deed. 6 N.C. (2 Mur.) 391, 418-19 (1818). The Court said that the General Assembly violated separation of powers by exercising power reserved for the judiciary. Id. at 419. The Court noted that in passing the act, the legislature was attempting to determine “the effects in law of the several deeds. By the Constitution they are restricted from this exercise of power; they are to make the law, and the judicial power is to expound and determine what cases are within its operation.” Id.
Similarly, in a more recent case, Bacon v. Lee, a convicted criminal asked this Court to intrude into the Governor’s clemency review — an explicit constitutional power vested in the Governor since 1776. 353 N.C. at 704, 549 S.E.2d at 846-47. The criminal defendant sought substantive review from this Court because the then-serving Governor had represented the State during Bacon’s appeal. Id. at 701-02, 711, 549 S.E.2d at 844-45, 851. This Court concluded that clemency was an explicit constitutional power of the Governor to be exercised solely at the Governor’s discretion. Id. at 704, 549 S.E.2d at 846-47. As such, clemency was a non-justiciable, political question. Id. at 716-17, 549 S.E.2d at 854. In explaining nonjusticiability, the Court noted that any substantive review by the Court would interfere with the Governor’s express constitutional authority. Id. at 716-17, 549 S.E.2d at 854. When one branch interferes with another branch’s performance of its constitutional duties, it attempts to exercise a power reserved for the other branch. Id. at 721-22, 549 S.E.2d at 857. Therefore, if the Court conducted a substantive review of the clemency proceeding, the judicial branch would be exercising a power constitutionally reserved for the Governor, thus violating separation of powers. Id. at 721-22, 549 S.E.2d at 857.
As discussed, the General Assembly has the constitutional power to assign itself the authority to fill statutory positions; this designation does not violate separation of powers. From our founding, the authority to appoint has simply been a mode of filling the position and has not in any way implicated control over the official or an exercise of any official duties. Cunningham, 124 N.C. at 642-43, 33 S.E. at 139 (holding that legislative appointment is “only a mode of filling the offices” and that “[t]his view . . . was strictly in accordance with the constitutional history of this State”); Jones, 116 N.C. at 580, 21 S.E. at 790 (Avery, J., concurring) (“[B]efore any such express power was given or limited to the Chief Executive, when by the Constitution as amended in 1835 no express grant of authority to appoint or elect was conferred upon either of the coordinate departments, the residuary power of the people to provide for filling offices, already existing, and to create others, was exercised *662 by their representatives in the General Assembly.”); Trs. of Univ. of N.C. v. McIver, 72 N.C. 76, 85 (1875) (“Now the election of officers is not an executive, legislative or judicial power, but only a mode of filling the offices created by law, whether they belong to one department or the other. The election of a judge is not a judicial power, nor the election of a Governor an executive power; for if so, all elections by the people would be an infringement upon the executive department.”).
If the appointing of the official is simply a mode of filling the position and does not implicate control, then the appointment does not in any manner amount to exercising the duties of the office. Thus, whether appointing an official or a majority of a group of officials, the appointing authority is not exercising any responsibilities of the position. This principle has existed since our independence from Great Britain and has been reiterated throughout our history.
In 1776 the Drafters of the Declaration of Rights in our state constitution provided for separation of powers, N.C. Const, of 1776, Declaration of Rights, § IV; the next day, those same Drafters specified legislative appointment of the entire executive and judicial branches, N.C. Const, of 1776, §§ XIII-XVI, XXII-XXIV. In appointing the Governor, the then-seven-member Council of State, an Attorney General, Secretary of State, and Treasurer, id., the General Assembly did not exercise the power of those offices. The authority to appoint all the officials of the other branches did not violate separation of powers because a separation of powers violation only occurs when one branch of government exercises the power belonging to another branch. Once appointed, the Governor and other executive branch officials each took an oath to perform the duties of the office and served a designated term. N.C. Const, of 1776, §§ XII, XV, XVI. Similarly, the legislature did not exercise the judicial power by creating a judicial system and appointing and removing judges. Id. § XIII. The judges took an oath to perform their duties and did so, despite the possibility of removal. Id. §§ XII, XIII.
Our original judges aptly demonstrated that a selected officer exercises independent judgment after appointment, even in the face of the legislature’s removal authority. In Bayard v. Singleton the three judges had been appointed by the General Assembly and were subject to removal by that body. See id. § XIII. Nonetheless, the judges held an act of the General Assembly unconstitutional. 1 N.C. (Mart.) at 7. The Court observed
that the obligation of their oaths and the duty of their office required them, in that situation, to give their opinion *663 on that important and momentous subject; and that notwithstanding the great reluctance they might feel against involving themselves in a dispute with the Legislature of the State, yet no object of concern or respect could come in competition or authorize them to dispense with the duty they owed the public, in consequence of the trust they were invested with under the solemnity of their oaths.
Id. at 6-7. As demonstrated by the behavior of the judges and their decision in Bayard v. Singleton, appointment was simply a means of filling the position, not controlling the official and thereby exercising the power of the office.[12]
Our current constitution and a variety of statutes continue to recognize that the authority to appoint an official does not result in control of the appointee; having and exercising such authority does not implicate separation of powers. The constitution and statutes place with one or more officials in one branch the authority to appoint officials in another branch.[13] Moreover, various statutory schemes allow for the branches to *664 share appointments[14] and even authorize the political parties to recommend certain appointees.[15] This historically recognized principle, that appointment is simply a means of filling the position, is true regardless of the function ultimately exercised by the official.[16] Thus, for example, when the Governor appoints a judge, the Governor is not controlling the judge or exercising a judicial power; separation of powers is not implicated. N.C. Const, art. IV, § 19.
The principle of separation of powers is certainly not implicated by the General Assembly’s appointment of a majority of the members of various executive commissions, particularly in light of the General Assembly’s significant express constitutional authority to assign executive duties to the constitutional executive officers and organize executive departments. The executive branch executes the laws as enacted by the General Assembly. The constitution expressly acknowledges the General Assembly’s power to assign duties and functions to the executive branch under its broad lawmaking power. N.C. Const. art. Ill, §§ 5(10), 7(l)-(2), 8, 11. The executive branch officials and their departments carry out these statutory duties and functions. Id. art. Ill, §§ 5(10), 7(l)-(2). The General Assembly retains the prerogative to change these duties, the organization of the executive branch, and the *665 branch’s supervisory structure. Id. art. Ill, §§ 5(10), 7(l)-(2), 11. Though the General Assembly may have assigned a particular function to a constitutional executive officer at present, the constitution provides that the legislature can assign that function elsewhere. Id.
To overturn a law of the people acting through the General Assembly, the Court must find an express constitutional violation beyond a reasonable doubt. As demonstrated by the text and history of our constitution and by our jurisprudence, the General Assembly in exercising its express constitutional lawmaking power has the authority to appoint a majority of the members of executive commissions that it has created by statute. The authority to appoint is simply a mode of filling positions and does not result in control over the appointed officials. Absent an explicit constitutional amendment such as that proposed in 1968, the General Assembly’s constitutional power, including its appointment authority, remains unchanged. While I agree with the majority that the statutes in question do not violate the appointments clause, id. art. Ill, § 5(8), I do not believe that the challenged provisions violate separation of powers. Accordingly, I concur in part and dissent in part.

. “The trae test is, where does the [state] Constitution lodge the power of electing the various public agents of the government. . . .” Cunningham v. Sprinkle, 124 N.C. 638, 642, 33 S.E. 138, 139 (1899) (quoting Trs. of Univ. of N.C. v. McIver, 72 N.C. 76, 85 (1875)). This precise question was asked and answered by this Court over 131 years ago. In rejecting the argument that the General Assembly violated separation of powers by exercising appointment authority over executive statutory offices, this Court stated that *650 "a mode of idling the offices created by law” is the prerogative of the General Assembly, acknowledging that filling the position is not exercising the power of the position. Id. at 642-43, 33 S.E. at 139. (Of note, many of the older opinions referenced in this opinion use the term “selection” when referring to a single appointing authority, such as the Governor, and “election” when referring to multiple decisionmakers, such as the General Assembly.)

. The Court of Conference was the predecessor of this Court, which was statutorily established in 1818. Walter Clark, History of the Supreme Court of North Carolina, in 177 N.C. 616, 619-20 (1919); see also Benzien’s Ex’rs v. Lenoir, 11 N.C. (4 Hawks) 403, 406 (1826) (noting “[t]he act of 1818, New Rev., ch. 962, constituting the present Supreme Court” and discussing the Court of Conference).

. Every one of our state constitutions has placed express limitations or prohibitions on legislative power. See, e.g., N.C. Const. of 1868, art. I; id., art II, §§ 13, 14 (prohibiting the passing of certain private laws and providing a procedure by which to pass permissible private laws); id., art. II, § 16 (prescribing the procedure for passing laws regarding state debt or credit); N.C. Const. of 1776, Declaration of Rights, § III (prohibiting “exclusive or separate emoluments or privileges,” except for “in consideration of public services”); id., Declaration of Rights, § XII (prohibiting seizure of person and “freehold liberties or privileges” and deprivation of “life, liberty, or property, but by the law of the land”); id., Declaration of Rights, § XIV (prohibiting the suspension of trial by jury); id., Declaration of Rights, § XXH (prohibiting “hereditary emoluments, privileges or honors”).

. Our constitution has even referred to the division of legislative power between the bicameral houses as “distinct branches” of government. N.C. Const, of 1868, art. II, § 1; N.C. Const, of 1776, § I.

. Notably, the statutes in question here do not provide for appointments by the “General Assembly” but instead distribute legislative appointments between the Senate and the House of Representatives. See Act of June 4, 2014, ch. 4, § 4(a), 2014 N.C. Sess. Laws 57, 61 (providing that the Oil and Gas Commission consists of nine members: three selected by the House, three by the Senate, and three by the Governor); id. § 5(a), 2014 N.C. Sess. Laws at 64435 (providing that the Mining Commission consists of eight members: two selected by the House, two by the Senate, two by the Governor, along with the State Geologist and the chair of the North Carolina State University Minerals Research Laboratory Advisory Committee); Act of Sept. 20, 2014, ch. 122, § 3(a), 2014 N.C. Sess. Laws 828, 832 (providing that the Coal Ash Management Commission consists of nine members: three selected by the House, three by the Senate, and three by the Governor).

. The terms for legislators were lengthened from one to two years by amendment in 1835. N.C. Const. of 1776, art. I, § 1 (1835).

. Professor John V. Orth is a legal historian and state constitutional scholar acknowledged and cited by both this Court and the United States Supreme Court. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 108, 120, 116 S. Ct. 1114, 1149, 1155, 134 L. Ed. 2d 252, 299, 306 (1996) (Souter, Ginsburg & Breyer, JJ., dissenting); Welch v. Tex. Dep’t of Highways & Pub. Transp., 483 U.S. 468, 499, 510 n.16, 520 n.20,107 S. Ct. 2941, 2959, 2965 n.16, 2970 n.20, 97 L. Ed. 2d 389, 413, 420 n.16, 426 n.20 (1987) (Brennan, Marshall, Blackmun & Stevens, JJ., dissenting); Hoke Cty. Bd. of Educ. v. State, 358 N.C. 605, 648, 599 S.E.2d 365, 397 (2004) (quoting and citing John V. Orth, The North Carolina State Constitution: A Reference Guide (1993)); Stephenson v. Bartlett, 355 N.C. 354, 367, 562 S.E.2d 377, 387 (2002) (referring to Orth as “a highly respected state constitutional scholar”).

. See State Constitution 25 (“[T]he General Assembly now reclaimed the power to provide for legislative appointments to executive offices created by statute.”). In 1911 two of the foremost legal scholars in North Carolina, Henry G. Conner, a former Supreme Court Justice, then serving as a federal district court judge, and Joseph B. Cheshire, Jr., an attorney in Raleigh, North Carolina, published an annotation of the state constitution. Henry G. Connor & Joseph B. Cheshire, Jr., The Constitution of the State of North Carolina Annotated i (1911). They stated that “the amendment to this section by the Convention of 1875 altered the Constitution as construed [previously] . . . and conferred upon the General Assembly the power to fill offices created by statute.”. Id. at 140. This Court has quoted and cited this valuable work on our state constitution throughout the past century. See, e.g., Coley v. State, 360 N.C. 493, 497, 631 S.E.2d 121, 125 (2006); State v. Furmage, 250 N.C. 616, 618, 109 S.E.2d 563, 564-65 (1959); Penny v. Salmon, 217 N.C. 276, 279, 7 S.E.2d 559, 561 (1940); Moose v. Bd. of Comm’rs, 172 N.C. 419, 441-42, 90 S.E. 441, 452 (1916) (Brown, J., concurring).

. Even though the word “ought” in both the 1776 and 1868 constitutions was changed to “shall” in the 1971 constitution, the Study Commission noted there was no substantive change to the separation of powers clause. Report at 73-75; see also Smith v. Campbell, 10 N.C (3 Hawks) 590, 591, 598 (1825) (providing that “ought” is synonymous with “shall,” noting that “the word ought, in this and other sections of the [1776 constitution], should be understood imperatively”).

. This Court has consistently recognized this application of the separation of powers principle. See, e.g., State v. Whitehead, 365 N.C. 444, 448-49, 448 n.1, 722 S.E.2d 492, 496 & n.2 (2012) (providing that the judiciary cannot exercise executive power under N.C. Const, art. Ill, § 5(6) to invalidate sentence for nonlegal error); Bacon, 353 N.C. at 717-18, 722, 549 S.E.2d at 854-55, 857 (recognizing that the judiciary cannot impose additional constraints on the executive’s “exclusive prerogative” to grant clemency under N.C. Const. art. III, § 5(6)); Hogan v. Cone Mills Corp., 315 N.C. 127, 138-40, 142-43, 337 S.E.2d 477, 483-44, 486 (1985) (holding the legislature cannot exercise judicial power extended to the Industrial Commission under the Worker’s Compensation Act by retroactively altering a judgment rendered by that agency); State v. Elam, 302 N.C. 157, 160, 273 S.E.2d 661, 664 (1981) (holding the General Assembly cannot exercise constitutional power granted to the judiciary under N.C. Const. art. IV, § 13(2) in making rules of appellate practice and procedure); Person v. Bd. of State Tax Comm’rs, 184 N.C. 499, 513-14, 115 S.E. 336, 345 (1922) (holding the judiciary cannot invalidate a statute found not in conflict with the exercise of the legislature’s constitutional taxation power under N.C. Const. of 1868, art. V, § 3); Houston v. Bogle, 32 N.C. (10 Ired.) 496, 503-04 (1849) (holding the legislature cannot exercise judicial power to retroactively determine “what the law is and what it was”); Hoke, 15 N.C. (4 Dev.) at 13-15 (holding the General Assembly violates separation of powers by exercising judicial power when it passes a law which attempts to settle a dispute between competing claimant to a public office); Robinson v. Barfield, 6 N.C. (2 Mur.) 391, 418-19 (1818) (holding that the legislature cannot exercise judicial power by deciding whether a deed “was executed according to . . . [the] law”); see also Ivarsson v. Office of Indigent Def. Servs., 156 N.C. App. 628, 631, 577 S.E.2d 650, 652 (“A violation of the separation of powers required by the North Carolina Constitution occurs when one branch of state government exercises powers that are reserved for another branch of state government.”), disc. rev. denied, 357 N.C. 250, 582 S.E.2d 269 (2003).

.See footnote 2.

. The commissioners appointed under the statutes at issue here likewise must taire oaths before taking on the responsibilities of their positions. See N.C.G.S. § 11-1 (2013) (“[OJaths . . . are necessary ... to the important end of good government . . . [and] ought to be taken and administered with the utmost solemnity.”); id. § 11-7 (2013) (“[E]very person elected or appointed to hold any office ... shall. .. take and subscribe to the following oath: T ... do solemnly and sincerely swear that I will... be faithful and bear true allegiance to the State of North Carolina, and to the constitutional powers and authorities which are or may be established for the government thereof; and that I will endeavor to support, maintain and defend the Constitution of said State ....’ ”); see also id. § 143B-13(a) (2013) (“[E]ach member [is appointed] on the basis of interest in public affairs, good judgment, knowledge, and ability in the field for which appointed, and with a view to providing diversity of interest and points of view in the membership.”).

. See N.C.G.S. §§ 7A-752, -753 (Chief Justice makes appointments to the Office of Administrative Hearings, housed in the executive branch); Melott, 320 N.C. at 526, 359 S.E.2d at 788 (Meyer, J., concurring in result) (recognizing that the Office of Administrative Hearings exercises judicial functions, yet is housed in the executive branch); see, e.g., N.C. Const, art IV, § 19 (Governor fills judicial vacancies); N.C.G.S. § 163-9(a) (2013) (same); see also N.C. Const. art. III, §§ 3(4), (5) (General Assembly determines Governor’s mental capacity and has power to impeach); id. art. HI, § 7(6) (General Assembly determines incapacity of executive officers); N.C.G.S. § 106-2 (2013) (Governor appoints Agriculture Board, housed under elected Council of State member); id. §§ 162-5, -5.1 (2013) (vacancy in the office of sheriff, exercising the executive function of enforcing the laws, filled by board of county commissioners, a legislative body).

. See, e.g., N.C.G.S. § 7A-375 (2013) (Judicial Standards Commission) (providing for thirteen members severally appointed by the Chief Justice, State Bar Council, Governor, and General Assembly to serve six-year terms, and for cause and disqualification removal); id. § 116D-2.1 (2013) (State Board of Community Colleges) (providing for twenty-one members appointed by the Governor and General Assembly, various limited terms, and removal by vote and recommendation from the Ethics Commission); id. § 138A-7 (2013) (State Ethics Commission) (providing for eight members, four each appointed by the General Assembly and Governor to serve staggered terms, and removal for cause).

. See, e.g., N.C.G.S. § 162-5.1 (2013) (In forty six counties, the board “shall elect the person recommended by” the prior sheriff’s political party to fill a vacancy in the office of sheriff.); id. § 163-19 (2013) (State Board of Elections) (providing for five members, requiring the Governor to appoint members from a list of nominees submitted by the two largest political parties, and limiting members to two consecutive four-year terms).

. See, e.g., N.C.G.S. § 62-10(f) (2013) (Utilities Commission) (independent commission performing judicial functions but residing in executive branch; members appointed by Governor subject to legislative confirmation); id. § 97-77(al) (2013) (Industrial Commission) (independent commission performing judicial fimctions but residing in executive branch; members appointed by Governor but must be confirmed by the General Assembly).